UNITED STATES, Appellee,

v.

Specialist Four Carlos MORENO, Jr., 312–74–0391, United States Army, Appellant.

CM 445359.

U.S. Army Court of Military Review.

30 April 1985.

present evidence on this issue was not justified. *See United States v. Salisbury,* 50 C.M.R. 175 (A.C.M.R.1975).

Captain Claudio F. Gnocchi, JAGC, argued the cause for the appellant. With him on the brief were Colonel William G. Eckhardt, JAGC, Lieutenant Colonel William P. Heaston, JAGC, and Major Edwin D. Selby, JAGC.

Captain Andrew D. Stewart, JAGC, argued the cause for the appellee. With him on the brief were Colonel James Kucera, JAGC, Lieutenant Colonel Adrian J. Gravelle, JAGC, and Major Thomas J. Leclair, JAGC.

Before SUTER, YAWN, and WALCZAK Appellate Military Judges.

## OPINION OF THE COURT

YAWN, Senior Judge.

Contrary to his pleas, appellant was convicted of the premeditated murder of Private First Class Sykes. Although appellant was married, he and Sykes had been romantically involved with each other. Prior to her death Sykes had been in the process of terminating this relationship.

Sykes was shot twice with a .357 magnum pistol. The first bullet entered her chest and penetrated her heart while the second entered her skull and penetrated her brain stem. Either shot, alone, would have been immediately fatal. Appellant was sentenced to a dishonorable discharge, confinement at hard labor for life, total forfeitures, and reduction to the grade of Private E–1. The convening authority approved the sentence.

Appellant contends that the military judge erred by allowing a military chaplain to testify about his conversation with appellant just after Sykes had been killed. Appellant asserts that this conversation was a privileged communication under Mil. R.Evid. 503 and should not have been admitted at trial. We agree.

Sykes was killed in her barracks room at Fort McClellan, Alabama. A little over an hour after the murder, appellant, a Catholic, appeared at one of the post chapels seeking a priest. Finding that no priest was on duty that day, appellant went to the Mental Health Activity and asked to see a therapist. He was given an appointment for two days later. Appellant then went to another chapel on post where he encountered Chaplain (Major) George, a Baptist

minister. According to George, appellant seemed extremely emotional and said he thought he was having a nervous breakdown. George told appellant, "Well, come on in, Son. Let's talk about it." Appellant came into George's office and, as he was sitting down, said, "I've sinned. I've hurt somebody real bad." Appellant then revealed to George that he had shot a woman in the barracks. George suggested that the woman may not have been too badly hurt and that a call should be made to the company to determine the woman's condition. George made this call and learned that Sykes had been shot and was dead. After completing this call George told appellant it "looked real bad." George stated he would have to call the military police. Appellant consented to George's calling the military police and told George to "tell them I want to go quietly." George then called the military police and told them he had a man who was "involved with the shooting at the building; that the man wanted to turn himself in."

When the military police arrived, appellant was apprehended and advised of his rights under Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831 (1982). Appellant declined to be interviewed and asked for a lawyer. Later in the day, Chaplain George was interviewed by the military police and, without seeking appellant's consent, gave a statement covering everything appellant had told him. This statement related not only appellant's ad-mission that he shot a woman but also detailed the problems appellant had been having with his wife, the financial pressures appellant felt, the nature of appellant's relationship with Sykes—their problems and arguments—and appellant's statement that he "really got mad" before he shot Sykes. George also related this information at trial over appellant's objection that the information was privileged under Mil.R.Evid. 503.

Mil.R.Evid. 503 embodies what is commonly known as the priest-penitent privilege.[1] Communications within this privilege are not to be revealed to third parties, without consent, at any time, in or out of court. Pursuant to this rule, appellant could prevent Chaplain George from disclosing communications that were confidential and made either as a formal act of religion or as a matter of conscience. Such communications are "confidential" if they are made to a chaplain in his capacity as a spiritual advisor and are not intended to be disclosed. Mil.R.Evid. 503(b)(1). The application of Mil.R.Evid. 503 to the present case raises an issue of first impression concerning the scope of the privilege created by this rule.

As a general matter, the priest-penitent privilege is a creature of statute. No such privilege existed at common law.[2] In recent times, almost universal recognition has been accorded to this privilege. The overwhelming majority of jurisdictions in

1. Mil.R.Evid. 503 provides:

Communications to clergy

(a) *General rule of privilege.* A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman or to a clergyman's assistant, if such communication is made either as a formal act of religion or as a matter of conscience.

(b) *Definitions.* As used in this rule:

(1) A "clergyman" is a minister, priest, rabbi, chaplain, or other similar functionary of a religious organization, or an individual reasonably believed to be so by the person consulting the clergyman.

(2) A communication is "confidential" if made to a clergyman in the clergyman's capacity as a spiritual adviser or to a clergyman's assistant in the assistant's official ca-pacity and is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the purpose of the communication or to those reasonably necessary for the transmission of the communication.

(c) *Who may claim the privilege.* The privilege may be claimed by the person, by the guardian, or conservator, or by a personal representative if the person is deceased. The clergyman or clergyman's assistant who received the communications may claim the privilege on behalf of the person. The authority of the clergyman or clergyman's assistant to do so is presumed in the absence of evidence to the contrary.

2. 8 J. Wigmore, Evidence § 2394 (McNaughton rev. 1961).

the United States now recognize such a privilege by statute. D. McCormick, Evidence § 77 (2d ed. 1972). *See* Annot., 71 A.L.R.3d 794 (1976). *See also Mullen v. United States*, 263 F.2d 275 (D.C.Cir.1958) (recognizes the privilege on the basis of policy in the absence of a statutory provision). An examination of these state statutes[3] provides little guidance in understanding the application of the privilege in the military since the language of Mil.R. Evid. 503 is broader in scope than the language found in most of these statutes.[4]

■ Our analysis of Mil.R.Evid. 503 begins with the proposition that testimonial exclusionary rules contravene the fundamental principle that "the public ... has a right to every man's evidence." 8 J. Wigmore, Evidence § 2192 (McNaughton rev. 1961). The government is generally entitled to receive assistance and information from everyone in seeking out and punishing criminals. A basic tenet of citizenship is that all owe a duty to give evidence when called upon to do so. These considerations are balanced against the recognition that the rules of evidence are concerned not only with truth but also with the manner of its ascertainment. *Mullen*, 263 F.2d at 280. The privilege regarding communications with a clergyman reflects an accommodation between the public's right to evidence and the individual's need to be able to speak with a spiritual counselor, in absolute confidence, and disclose the wrongs done or evils thought and receive spiritual absolution, consolation, or guidance in return. In the military the particular balance struck between these two concerns is reflected in Mil.R.Evid. 503 and demonstrates the military's sensitivity to preserving the confidentiality of communications to the clergy.

The military judge in this case apparently construed Mil.R.Evid. 503 as embodying a limited protection for such communications. While admitting the chaplain's testimony, the military judge stated, "if I were convinced by even one iota of evidence that the accused's sole and only purpose in consorting with the chaplain were to be shriven, to receive emotional and spirtual guidance and counseling, I would sustain the privilege." He explained that he believed appellant was using the chaplain as a vehicle to turn himself in and, thus, intended the chaplain relate the conversation with appellant to the military police. The military judge's ruling construes Mil.R.Evid. 503 too narrowly. The plain language of the rule does not limit the privilege to situations when one's sole purpose for a communication is to be shriven.

■ Three criteria must be met for the privilege on communications to clergy to attach: (1) the communication must be made either as a formal act of religion or as a matter of conscience; (2) it must be made to a clergyman in his capacity as a spiritual advisor or to his assistant in his official capacity; and (3) the communication must be intended to be confidential. All three of these criteria were met by the communication at issue. Chaplain George testified that, among the reasons he thought appellant came to him, was because appellant had a conscience and knew the chaplain to be a man of God. That testimony, plus appellant's opening remark to George, "I have sinned," satisfy the first two criteria.

With respect to the third criterion, Chaplain George stated that, although appellant never told him to disclose the contents of their conversation, he thought appellant came to the chapel to turn himself in and

---

3. For a comparison of the statutes governing the priest-penitent privilege in different states, see Reese, *Confidential Communications to the Clergy*, 24 Ohio St.L.J. 55 (1963).

4. Mil.R.Evid. 503 was taken from proposed Fed. R.Evid. 506 and paragraph 151*b*(2) of the Manual for Courts-Martial, United States, 1969 (Revised edition) [hereinafter cited as MCM]. *See* MCM, Change 5, App. 18, Rule 503, A18–70

(1980). *See also* J. Weinstein & M. Berger, Weinstein's Evidence, para. 506[03] (1982). Congress did not adopt proposed Fed.R.Evid. 506, just as it refused to adopt any of the rules concerning specific privileges. *Id.* at para. 501[2]. Currently, Fed.R.Evid. 501 sets forth one general rule to cover all privileges. *See* Fed.R.Evid. 501.

understood the chaplain would have to relate to the military police what appellant said. While this testimony reflects George's impression of appellant's purpose in visiting him, the facts indicate that appellant's purpose in seeking a chaplain, in the first instance, was to receive spiritual consolation. Appellant's later willingness to turn himself in does not indicate that he consented to the communication being disclosed. Such an interpretation of appellant's acts fails to consider that George could have easily arranged for appellant to "turn himself in" without disclosing the contents of their conversation. As we read Mil.R.Evid. 503, appellant's intent is controlling, not George's impression of it. We find no evidence that appellant intended Chaplain George to reveal their conversation to other parties. Instead, we believe appellant's intent that the communication be confidential is adequately revealed by his initial purpose for speaking with George and by his later refusal to make a statement to investigators after being apprehended. We conclude the military judge committed error in allowing Chaplain George to testify over appellant's objection.

▇▇▇ An error not of constitutional dimension may be found harmless if the fact finder was not influenced by it or if the error had but a slight effect on the resolution of the issues in the case. *United States v. Barnes*, 8 M.J. 115, 116 (ACMR 1979). *See also United States v. Bledsoe*, 19 M.J. 641, 645 (AFCMR 1984). In the case at bar appellant was convicted of premeditated murder. Given the facts of this case we cannot say the admission of the conversation between appellant and Chaplain George was harmless. Although competent evidence, independent of the conversation, overwhelmingly established appellant's guilt of unpremeditated murder, admission of the conversation may have affected the court members' finding that appellant had a premeditated design to kill. As noted previously, during this conversation appellant told the chaplain that he "really got mad" before he shot Sykes. This statement is the only direct evidence concerning appellant's state of mind at the time of the offense. While the circumstantial evidence in this case supports a finding of premeditated murder, it does not compel such a finding. Accordingly, the evidence at issue may have been a significant factor in the court members' determination that appellant committed premeditated murder. Under these circumstances, appellant's conviction for premeditated murder cannot stand. Rather than affirm a conviction of unpremeditated murder based upon the independent evidence in this case, we shall order a rehearing.

The findings of guilty and the sentence are set aside. The record of trial is returned to The Judge Advocate General for submission to the same or a different convening authority. The convening authority may order a rehearing as to the Charge and its specification and as to sentence. If he determines that a rehearing on the Charge and its specification is impracticable, the convening authority may approve a finding of guilt of unpremeditated murder in violation of Article 118(2), Uniform Code of Military Justice, 10 U.S.C. § 918(2) (1982), or such lesser included offense of unpremeditated murder as he finds appropriate, and order a rehearing on sentence only. If he determines a rehearing on sentence only is impracticable, the convening authority may reassess the sentence.

Chief Judge SUTER and Judge WALCZAK concur.