**UNITED STATES**

v.

**Master Sergeant Doris L. NAPOLEON, FR222–36–4556, United States Air Force.**

**ACM 31332.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 12 March 1994.

Decided 26 April 1996.

538

Appellate Counsel for Appellant: Colonel Jay L. Cohen, Captain Eric N. Eklund, and Captain J. Knight Champion, III.

Appellate Counsel for the United States: Colonel Jeffery T. Infelise and Major Jane M.E. Peterson.

Before DIXON, SCHREIER, and STARR, Appellate Military Judges.

## OPINION OF THE COURT

STARR, Judge:

Arlyta Renee Harris was stabbed to death with a kitchen knife in the parking lot of the Vandenberg Air Force Base Noncommissioned Officers' (NCO) Club during the very early morning hours of 31 July 1993. There were no eyewitnesses, but suspicion centered almost immediately upon the appellant, and she was ultimately convicted of premeditated murder. The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for life, forfeiture of all pay and allowances, and reduction to E–1. The appellant presents three issues for our consideration: that the military judge erred by failing to suppress her statements to an Air Force Office of Special Investigations (AFOSI) agent; that the military judge erred by failing to grant a defense challenge for cause; and that her two trial defense counsel were ineffective by failing to object to testimony that revealed privileged communications between the appellant and a "lay minister." We reject these contentions, and we affirm the findings and sentence.

The appellant first claims the military judge erred by failing to suppress her inculpatory statements, made several hours after

the stabbing, to Special Agent Kelly of the AFOSI. At the initial Article 39(a), UCMJ, 10 U.S.C. § 839(a), session, the appellant moved to suppress the statements, because when advising her of her rights under Article 31(b), UCMJ, Kelly told the appellant only that she was suspected of "stabbing" the victim, deliberately avoiding use of any word that would disclose the victim's death, although he knew the victim had died. At the time of the interview, the appellant did not know the victim had died, and Kelly did not want her to know.

The military judge ruled against the appellant, concluding the information Kelly provided the appellant "was sufficient to orient her as to the nature, transaction, or incident of which she was suspected." Notwithstanding the military judge's ruling, the prosecution did not offer the appellant's pretrial statements to Kelly into evidence during its case. After the conclusion of the prosecution's case, the defense rested without presenting evidence. According to the appellant, however, the issue is not moot, "since the military judge's pretrial ruling definitely affected trial defense counsel's tactical and strategic decisions throughout the trial."

This claim of error warrants only brief comment. First, the appellant does not tell us what trial decisions were affected by the ruling, and we are in no position to speculate about other paths the defense might have taken with a different ruling. We observe, however, that had the judge ruled the statements inadmissible on the theory advanced by the defense, and had the appellant taken the witness stand and testified any differently than her pretrial statements, the prosecution could still have used them for impeachment purposes. Mil. R. Evid. 304(b)(1). Second, the appellant offers no authority for the proposition that error may be preserved when an objected-to inculpatory statement by an accused is not presented to the factfinder, and we have found no such authority. There is, however, authority to the contrary in analogous situations. *See United States v. Gee,* 39 M.J. 311 (C.M.A.1994) (*in limine* ruling signaling probable admission of prosecution evidence, never admitted, held insufficient to preserve issue); *United States v.*

*Saul,* 26 M.J. 568, 572–73 (A.F.C.M.R.1988), *pet. denied,* 27 M.J. 434 (C.M.A.1988) (judge's refusal to preliminarily rule on evidence of uncharged misconduct, never admitted, held insufficient to preserve issue); *United States v. Rusinskas,* 35 M.J. 808, 809 (N.M.C.M.R.1992) (*in limine* denial of defense motion to suppress prior conviction as impeachment, never admitted, held insufficient to preserve issue). We therefore reject the appellant's first claim of error.

■ The appellant next claims the military judge erred by denying the defense challenge for cause of Colonel (Col) Peterson. During the general *voir dire,* the military judge named the potential witnesses, one of whom was the local AFOSI detachment commander. Col Peterson said he knew the witness, and in response to the military judge's questions, he said the witness was "very credible because of the job he has." Col Peterson then said he would follow the judge's instructions on witness credibility and would not automatically believe the witness' testimony without weighing it against other evidence. During individual *voir dire,* in response to questions by the defense counsel, Col Peterson said he knew the witness because of some cases he had worked through the AFOSI office. He also explained his earlier comment. Of the witness he said: "I've worked with him and found him to be an individual that if I were a commander, I would want him in my organization." He then reiterated that if there were contradictions between the witness' testimony and other evidence, he would weigh the evidence before making a credibility determination.

The defense counsel then asked Col Peterson what he had heard about the case. Col Peterson answered that soon after the incident, he had been in a staff meeting where it was announced there had been a problem at the club and someone had been killed. He added that he could not remember how the information was presented. He also said that some articles had appeared in the paper soon after the incident. When asked what he remembered from the articles, he said:

> What I can remember was that there was an altercation at the NCO club. An individual was stabbed. It was a female that

had worked at the commissary and it occurred at the parking lot. The —— what was it —— there was a lot of blood in the parking lot. It was a stabbing. And that's about it. It ended up in the hospital emergency room.

Col Peterson added he had not drawn any conclusions based on the articles, and he would rely on evidence he saw and heard in court, rather than what he had read, in deciding the case.

The defense counsel challenged Col Peterson for cause, which the military judge denied, although he granted three other defense causal challenges based upon personal knowledge of the facts of the case. The defense then removed Col Peterson with its peremptory challenge, but preserved the issue for review. R.C.M. 912(f)(4); *United States v. Jobson,* 31 M.J. 117, 120 (C.M.A. 1990).

■ An accused is entitled to members who will keep an open mind, decide the case on the evidence presented, and follow the judge's instructions on the law. While the side that asserts a challenge for cause has the burden of proving the grounds for it, the military judge should view challenges for cause with a liberal eye. However, we will reverse the denial of a challenge for cause only for a clear abuse of discretion. *United States v. Barrow,* 42 M.J. 655, 660 (A.F.Ct. Crim.App.1995), *pet. granted,* 43 M.J. 418 (1995).

■ A member is not *per se* disqualified from serving because he professionally knows a particular witness, possesses a degree of professional respect for a particular witness, or has read or heard about facts in the case. *United States v. Lake,* 36 M.J. 317, 324 (C.M.A.1993); *United States v. Arvie,* 7 M.J. 768, 771–72 (A.C.M.R.1979). Instead, the military judge must determine whether an actual or implied bias exists which disqualifies the member. An actual bias exists when the member has a personal belief or attitude that will not yield to the evidence and the judge's instructions. An implied bias exists when the member's continued presence would cast substantial doubt on the legality, fairness, and impartiality of the trial.

R.C.M. 912(f)(1)(N); *Barrow,* 42 M.J. at 660. The focus of the implied bias rule is on the perception or appearance of fairness of the military justice system. *United States v. Dale,* 42 M.J. 384, 386 (1995).

■ Based on the member's unchallenged and unequivocal statements that he could impartially decide the case, we analyze this issue as one of implied, rather than actual, bias. *See United States v. Moyar,* 24 M.J. 635, 638 (A.C.M.R.1987). Therefore, the inquiry focuses on whether a reasonable, disinterested layman would think the proceedings would smack of unfairness with the challenged member's continued presence. *Barrow,* 42 M.J. at 661. Although another military judge faced with the same facts might have granted the challenge for cause, we believe that a reasonable, disinterested layman would not see unfairness in Col Peterson's continued presence. Instead, we believe a layman would see a member who conscientiously answered the questions asked of him and who clearly understood his duty to sit as an impartial trier of fact. We therefore conclude the military judge did not abuse his discretion in denying the challenge.

■ Finally, the appellant claims she was denied the effective assistance of counsel because her trial defense counsel did not object to testimony she maintains was inadmissible under the privilege of confidential communications to a clergyman. In an affidavit prepared 13 months after her trial and approximately a year and a half after the events she recounts, the appellant describes a conversation she had with TSgt Walters, who visited her several times during her pretrial confinement. She states:

TSgt Walters and I belonged to a lot of the same committee's [sic] and were members of the Hospital Top Four group. I also knew he was a lay minister at one of the little chapel's [sic] on Vandenberg AFB, CA, and that he was very involved with those activities. During his first visit with me, he informed me that while he was out mowing his lawn that day, when all of a sudden he felt compelled to come and visit me, as one of his fellow sisters in trouble and need. It was during this visit with TSgt Walters that I was compelled to lay

my burdens before him. I told him that I could not understand why the seemly [sic] normal acts of that night (30 July 93), could go from a calm, no anger atmosphere to a confrontation that led to a person's death. On another occassion [sic] when TSgt Walters paid me a visit, he was accompanied by his wife, at the completion of that visit, TSgt Walters conducted a prayer session for me. Because TSgt Walters was a lay minister, I felt very confident in expressing and releasing my innermost feelings, since I knew that all communications with ministers and chaplains were considered privileged communications. Both [trial defense counsel] knew that TSgt Walters was a lay minister.

TSgt Walters also submitted an affidavit, likewise executed 13 months after trial and approximately a year and a half after the conversations he remembers, in which he states:

I visited MSgt Doris Napoleon during her stay at the detention facility at Vandenberg AFB, CA in the summer and fall of 1993. My visits were through our common organization and as a co-member of the Hospital Top Four. I am also a lay minister at the Base Chapel (# 2) and on one occassion [sic] my wife and I prayed with MSgt Napoleon between August and September 1993. My visits with MSgt Napoleon were to see if her children were taken care of and if she needed our help for anything. Periodically I would drop a gallon of drinking water by for her due to poor water conditions in the facility. As a servant of the Lord Jesus Christ I followed my teaching to visit those in captivity. At my first visit she informed me she was visited by a Chaplain, Col Chan (Hospital Commander), and her Supervisor (Col Barnicott) among others. The First Sergeant told me she could have visitors on weekends. She seemed very encouraged by their support and pleased to see me too.

The two trial defense counsel have not submitted affidavits in response to that of the appellant. *See United States v. Boone,* 42 M.J. 308, 313 (1995) (trial defense counsel may choose to respond to an allegation of ineffectiveness, but cannot be compelled to

unless a court of competent jurisdiction finds that the allegation and record contain evidence which, if unrebutted, would overcome the presumption of competence).

Walters did not provide evidence at the Article 32, UCMJ, investigation, but at trial he was called as a witness by the prosecution. The trial counsel directed Walters' attention to 7 August 1993 (about a week after the murder and the appellant's placement in pretrial confinement) and asked if Walters remembered a conversation with the appellant that day. Walters said yes, that on that day he was "visiting her as a friend." When asked what the appellant had said to him, Walters answered:

Basically when I approached Sergeant Napoleon that day, I came to see her at about one o'clock or so and we, basically, met each other and we sat down and we talked. And the first thing that we got into, she said that she was fine and, you know, she was awake and out of shock. For the most part, she was letting us know that she was okay because that was my main reason for being there. At that point, you know, we said you know, she realized what had happened and everything that had been done. And she definitely told me at that time that she wasn't angry or enraged or anything when the incident occurred. It just kind of went on from there.

Walters' direct examination ended with his testimony that the appellant said she knew what she did was wrong. During cross-examination, the trial defense counsel focused on the appellant appearing to be "coming out of shock" during the conversation. Counsel got Walters to concede the appellant did not look like her "normal self" and appeared distraught during the conversation. Cross-examination concluded with Walters' testimony that he believed the appellant's realization of wrongdoing was her conclusion at the time of their conversation, rather than her feeling at the time of the incident. During redirect, Walters again stated that during their conversation the appellant seemed to be in a state of shock. Trial counsel, apparently sensing the point of diminishing returns, ended the examination; and the defense counsel had no recross-examination.

According to the appellant, the performance of her trial defense counsel in not asserting the Mil. R. Evid. 503 privilege against Walters' testimony fails the test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The appellant maintains that prejudice is obvious because Walters' testimony was the only "direct evidence of premeditation," without which "there probably would have been a finding of unpremeditated murder or voluntary manslaughter."

 A trial defense counsel enjoys a strong presumption that he or she has rendered effective assistance and made all significant decisions in the exercise of reasonable professional judgment. *United States v. Kibler,* 43 M.J. 725, 730 (Army Ct.Crim.App. 1995). To prevail on a claim of ineffective assistance of counsel, an appellant has a heavy burden in overcoming that presumption. An allegation of ineffectiveness must clearly explain the exact manner in which the trial defense counsel was deficient so that the government and the appellate court may sensibly evaluate it. *United States v. Walters,* 42 M.J. 760, 762 (Army Ct.Crim.App.1995). Then the appellant must present enough credible evidence, which, when considered together with the evidence contained in the entire appellate record, establishes two elements. First, the appellant must show the trial defense counsel was deficient. This requires showing that the trial defense counsel made errors so serious that counsel was not providing the assistance guaranteed by the Sixth Amendment. Second, the appellant must show that the deficient performance prejudiced the defense. This requires showing that the trial defense counsel's errors were so serious they deprived the appellant of a fair trial, a trial whose result is reliable. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

 The test of counsel's performance is not that he or she lost; and it is not that some options were not pursued or could have been pursued differently, without regard to the degree of utility or the potential hazard of each. *United States v. Ingham,* 42 M.J. 218 (1995). The benchmark for judging any claim of ineffectiveness is whether counsel's performance so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Kibler,* 43 M.J. at 731. Finally, if we conclude the strong presumption of the trial defense counsel's effectiveness has not been overcome by the appellant's submissions and the record before us, we may dispose of the issue without further intruding into the attorney-client relationship by requiring a response from the trial defense counsel. *United States v. Lewis,* 42 M.J. 1, 6 (1995).

We have no difficulty resolving this issue against the appellant without requiring any response from the trial defense counsel. First, the appellant has not carried her burden of showing her counsel were deficient. Based on the affidavits and on Walters' testimony, we are unpersuaded that a defense objection to his testimony would have been sustained. Second, there was no prejudice to the appellant. Even if Walters' testimony had been excluded, we are convinced the findings would have been the same.

 The privilege regarding communications with a clergyman "recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). It reflects an accommodation between the public's right to evidence and the individual's need to confide in a spiritual counselor. Its foundation contains three elements: (1) the communication must be made either as a formal act of religion or as a matter of conscience; (2) it must be made to a clergyman in his capacity as a spiritual advisor; and (3) the communication must be intended to be confidential. *United States v. Moreno,* 20 M.J. 623, 626 (A.C.M.R.1985). In the second element, "clergyman" is defined as a minister, priest, rabbi, chaplain, or other similar functionary of a religious organization, or an individual reasonably believed to be so by the person consulting the clergyman. Mil. R. Evid. 503(b)(1).

It is clear from both affidavits the 7 August 1993 conversation and the prayer ses-

sion were two different encounters. We are not dealing with the prayer session, which came later and which, according to the appellant, was also attended by Walters' wife. In resolving the issue, we analyze the actual statements that Walters attributed to the appellant in his testimony, not what the appellant recalls in her affidavit as her statement to him. While the appellant's affidavit is useful in determining the circumstances surrounding the 7 August 1993 conversation, it is the precise statements by the appellant that Walters related in his testimony that count. These are: "And she definitely told me at that time that she wasn't angry or enraged or anything when the incident occurred," and "I know what I did was wrong." Based on the affidavits and on Walters' testimony, we are not persuaded the appellant has shown either the first or second elements required to invoke the privilege.

The appellant fails to show that during the 7 August 1993 conversation she was confiding in Walters as a formal act of religion or as a matter of conscience. According to Walters' trial testimony, "she was letting us know she was okay because that was my reason for being there." Nothing in his testimony or in his affidavit gives the slightest indication that Walters perceived the appellant's purpose as seeking spiritual counseling from him. It is clear to us that she was not confiding in Walters as a formal act of religion or as a matter of conscience. While she may have been seeking emotional comfort and perhaps sympathy in speaking with Walters about her feelings of not being angry or enraged, this does not amount to confiding in him as an act of formal religion or as a matter of conscience. Her purpose in making the comments was thus outside the privilege. *United States v. Coleman*, 26 M.J. 407 (C.M.A. 1988) (accused's admissions to father-in-law minister that he molested daughter not made as formal act of religion or as matter of conscience, but instead for emotional support).

The appellant has also failed to establish the second element. We are not persuaded the appellant made the comments to Walters in his capacity as a spiritual advisor. Whatever Walters' credentials and responsibilities

as a "lay minister" entailed, it is clear he was not operating in a spiritual advisor capacity during the 7 August 1993 conversation. Both his affidavit and his testimony demonstrate he was visiting the appellant as a friend and as a fellow member of the Hospital Top Four group. During his testimony, Walters said nothing about his affiliation with Chapel #2 or anything relating to his lay ministry. Surely, if he was authorized by his church to administer spiritual counseling, and if he thought he had engaged in spiritual counseling with the appellant, it would have occurred to him that a privilege might exist affecting his ability to testify as a prosecution witness. We see absolutely nothing in his testimony to even hint of such a concern. Further, all we are told in the affidavits is that Walters was a lay minister. We are told nothing about what that meant to him in the context of spiritual counseling, and we decline to speculate about how he saw his role. *See United States v. Garries*, 19 M.J. 845, 859–60 (A.F.C.M.R.1985), *aff'd*, 22 M.J. 288 (C.M.A.1986) (church deacon, not qualified to perform substantive pastoral duties, considered conversation with accused nonprivileged).

The appellant has a heavy burden here, but she provides very little in the way of substantive evidence to support her position. *See United States v. McCastle*, 43 M.J. 438, 440 (1996) (insufficient factual basis to support claim). It is tempting to agree with appellate government counsel that the theory advanced by the appellant is merely an afterthought. In any event, we are convinced that had the appellant offered the trial court the same foundation she now advances regarding her conversation with Walters, any defense objection under Mil. R. Evid. 503 would have suffered rejection, and correctly so. Therefore, the appellant has not sustained her burden of showing her trial defense counsel were deficient. *See United States v. Loving*, 41 M.J. 213, 245–46 (1994) (no deficiency in defense counsel performance for not objecting to uncharged misconduct where appellate court reviews testimony and determines that an objection would not have been meritorious).

Even if we are in error concerning the availability of a defense objection to Walters' testimony, the appellant's claim also fails under the second prong of the *Strickland* test, further amplified in *United States v. Tharpe,* 38 M.J. 8, 10–11 (C.M.A.1993). If ineffective assistance of counsel is found to exist, is there a reasonable probability that, absent the error, the fact finder would have had a reasonable doubt respecting guilt? In other words, had the trial defense counsel prevented Walters' testimony under Mil. R. Evid. 503, is there a reasonable probability the appellant would have been acquitted or convicted of a lesser offense? The unequivocal answer is no. There is ample evidence, much of it far more compelling than Walters' brief testimony, that the appellant possessed a premeditated design to kill the victim.

The appellant and the victim were not friends. They had become competitors for the same man, TSgt Crawford, the NCO Club night manager; and the appellant was losing. The appellant and Crawford had been romantically involved for over a year, when about a month before the murder, Crawford had broken it off and had begun a similar relationship with the victim. The evidence showed the appellant devoted a great deal of time that month to attempting to change Crawford's mind, without success.

On the night of the murder, the appellant went to the NCO Club, where she located Crawford and the victim. The appellant stayed until closing; and then followed the victim to Crawford's dormitory room, knowing Crawford was still occupied with his duties at the club. The appellant then managed to get the victim into the appellant's car and drove the victim back to a remote part of the club parking lot. There the appellant stabbed the victim in the chest with such force that she produced a wound six inches deep with a knife whose blade was less than five inches long. With just the first blow (of a total of four or five), the knife penetrated the victim's heart, diaphragm, and liver.

Although the appellant did not habitually carry a knife, she had two knives with her that night. One was found in her purse when she was searched. The knife the appellant used to kill the victim, found nearby with the appellant's fingerprint on it, matched a set of knives from a butcher block in the appellant's home, one of which was missing when authorities searched her home the next day.

Additional evidence of a premeditated design to kill the victim is found in the appellant's preparation of a story to account for her presence with the victim. A security policeman who arrived on the scene almost immediately after the stabbing, even before the arrival of medical emergency personnel, described the appellant as being "very calm, very cool, didn't seem to be upset" as she told him she had been driving near the shoppette when she saw the victim, who asked for a ride back to the club. According to the appellant, when they arrived at the club, she opened the door, the dome light came on, and she noticed for the first time the victim was bleeding. She helped the victim to the door of the club, which explained the large quantity of blood on her skirt and legs. Clearly, these fabricated statements just after she stabbed the victim were far more damning to the appellant's case on the issue of premeditation than the statements Walters attributed to her a week later.

The evidence of the appellant's premeditated design to kill was compelling. We have no doubt that absent Walters' testimony, the court's finding would be exactly what it was—guilty of premeditated murder. There is simply no reasonable possibility the appellant would have been acquitted or convicted of a lesser offense without Walters' testimony. We therefore also reject the appellant's third assignment of error.

The findings and the sentence are correct in law and fact and are

AFFIRMED.

Chief Judge DIXON and Senior Judge SCHREIER concur.