UNITED STATES

v.

Michael S. ISHAM, 455 37 8951,
Lance Corporal (E–3), U.S.
Marine Corps.

NMCM 97 00126.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 16 July 1996.

Decided 8 April 1998.

LT Robert Attanasio, JAGC, USNR, Appellate Defense Counsel.

Maj Albert Diaz, USMCR, Appellate Defense Counsel.

LT Russell J.E. Verby, JAGC, USNR, Appellate Government Counsel.

LCDR Paul Jones, JAGC, USNR, Appellate Government Counsel.

Before LUCAS, Senior Judge, OLIVER
and LEO, Appellate Military Judges.

OLIVER, Judge:

A military judge, sitting as a special court-martial, convicted the appellant, contrary to his pleas, of communicating a threat, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 (1994)[hereinafter UCMJ]. He was sentenced to confinement for 88 days, reduction to the lowest enlisted pay grade, and a bad-conduct discharge. The convening authority approved the sentence as adjudged and, except for the bad-conduct discharge, ordered it executed.

We have carefully reviewed the record of trial, the three assignments of error,[1] and the

1. I. THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION TO BAR THE CHAPLAIN'S TESTIMONY IN THIS CASE BECAUSE APPELLANT'S CONVERSATION WITH THE CHAPLAIN WAS PROTECTED BY THE PRIEST–PENITENT PRIVILEGE.

II. THE MILITARY JUDGE COMMITTED PLAIN ERROR BY ADMITTING APPELLANT'S STATEMENT TO THE CHAPLAIN INTO EVIDENCE ONCE THE MILITARY JUDGE DETERMINED THAT APPELLANT COULD NOT RELY

ON THE CLERGY–PENITENT PRIVILEGE TO BAR THE CHAPLAIN'S TESTIMONY.

III. THE EVIDENCE WAS INSUFFICIENT TO CONVICT APPELLANT OF COMMUNICATING A THREAT BECAUSE APPELLANT'S UTTERANCE WAS (1) MADE WHILE HE WAS IN GREAT MENTAL DISTRESS AND THEN ONLY IN AN EFFORT TO GET PROFESSIONAL HELP; AND (2) CONDITIONED ON A VARIABLE THAT COULD NOT REASONABLY OCCUR.

Government's response thereto. We also heard oral argument on the first assignment of error. Because we find merit in that assignment of error, we set aside and dismiss the findings and the sentence.[2] We provide our reasoning below.

The appellant made the statements for which he was convicted of communicating a threat during an appointment with the battalion chaplain. Shortly into the conversation, the appellant explained that he was struggling with stress and depression and felt that he would hurt himself unless he got some help. The chaplain immediately stopped the appellant and determined that he had attended at least one of his suicide-prevention classes. The chaplain then explained that, while most of what was said during a counseling session with a chaplain was confidential, he could not so treat plans to harm oneself or another person. Although the appellant testified in support of his motion to suppress that this warning came after he had made his incriminating statements, the military judge found, as do we, that the chaplain's testimony as to the timing is the far more credible. Record at 42–43.

Rather than repeating the testimony of the chaplain and the appellant on the motion, we will quote relevant portions of the military judge's essential findings of fact:

> Lieutenant B[ ] is a clergyman within the meaning of Military Rule of Evidence 503. Both the accused and the chaplain intended their meeting to be confidential; i.e., a closed-door meeting, both literally and within the meaning of Military Rule of Evidence 503.
>
> The accused within about 30 seconds in approximately a 30–minute meeting informed the chaplain that he needed help and was depressed and was thinking about hurting himself. The chaplain immediately informed the accused that if he expressed an intention to commit suicide, to harm himself or others, or if he informed the chaplain about any domes-

tic abuse, such information would not be treated confidentially, and it would have to be reported. Lieutenant B[ ] asked the accused if he understood the parameters of their meeting, and the accused stated he did, both verbally and by nodding his head in an affirmative fashion. The chaplain was acting under the guidance of his particular religion and Chaplain Corps rules on confidentiality and was authorized to set such rules....

> ....

> I find the defense has failed to carry its burden and, in fact, the government has convinced me by a preponderance that the accused's statements to the chaplain about harming himself and others was not privileged. I also question whether these statements might be an exception to the privilege anyway, but this is not the basis for my ruling, rather the chaplain limited what is privileged, and the accused agreed to that limitation.

> The defense motion to suppress is denied.

Record at 42–43 (citation and explanation of the basis for believing the chaplain rather than the appellant as to the sequence of events omitted).

Although the military judge did not make it part of his findings, both the appellant and the chaplain testified that the chaplain would tell only those people who needed to know to get him the help he needed. The appellant testified that if he had known the chaplain "was going to tell other people," he would not have spoken with him. Record at 13. He continued: "I wanted to keep it confidential. That way, nothing would affect me in the battalion. I could get help for my problems and without making everybody look at me as a bad Marine, sir." *Id.* The chaplain came to a similar conclusion: "I felt that that was getting him the help that he needed, keeping confidential the personal issues that we talked about that he wanted to be kept confidential and, as I communicated with the command, that we needed to make sure that as

---

2. We also see considerable merit in the appellant's argument that his statement to the chaplain was sufficiently qualified and given under such circumstances that it did not constitute communicating a threat. This contention gave rise to the third assignment of error. However, we resolve the case on the first assignment of error and do not reach the issue.

few people knew about this as possible. We needed to get help for the Marine but contain it." Record at 27–28. Based on this testimony, we find that both the appellant and the chaplain intended to limit the scope of further communication of the appellant's statements to those necessary to get him further professional help and to avoid harm to the appellant and others.

Military Rule of Evidence 503, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), provides for a testimonial "privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman ... if such communication is made either as a formal act of religion or as a matter of conscience." MIL.R.EVID. 503(a). In *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980), the Supreme Court observed that this privilege recognizes "the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return."

We have located only a handful of appellate cases on the application of this rule in the military, none of which was on point. Civilian courts rarely face the issue as well. This is no doubt because "[f]ew members of the clergy are called to testify against those who have sought religious counseling from them." 2 STEPHEN A. SALTZBURG ET AL., FEDERAL RULES OF EVIDENCE MANUAL 746 (7th ed. 1998)("Clergy-communicant privilege"). Because of their religious training, chaplains would normally hesitate to step forward to reveal incriminating information concerning a penitent. And even in cases where this happened, convening authorities would be hesitant to prosecute a servicemember based on what he or she told a chaplain. Chaplains are trained to provide appropriate intervention based on what they learn during religious counseling. Rarely, if ever, would this entail testifying against the Sailor or Marine at court-martial.

Despite the paucity of appellate cases, however, there is a body of law to apply toward the resolution of the issue. "The privilege regarding communications with a clergyman reflects an accommodation between the public's right to evidence and the individual's need to be able to speak with a spiritual counselor, in absolute confidence, and disclose the wrongs done or evils thought and receive spiritual absolution, consolation, or guidance in return." *United States v. Moreno*, 20 M.J. 623, 626 (A.C.M.R.1985). The question of whether a privilege applies to a conversation "is a mixed question of law and fact." *United States v. Napoleon*, 46 M.J. 279, 284 (1997)(citing *United States v. Coleman*, 26 M.J. 407, 409 (C.M.A.1988)), *cert. denied*, —— U.S. ——, 118 S.Ct. 375, 139 L.Ed.2d 292 (1997).

In *Moreno*, 20 M.J. at 626, our Army brethren listed three criteria for the privilege on communications to clergy to apply: "(1) the communication must be made either as a formal act of religion or as a matter of conscience; (2) it must be made to a clergyman in his capacity as a spiritual advisor ...; and (3) the communication must be intended to be confidential." The Court of Military Appeals (now the Court of Appeals for the Armed Forces) adopted the three-part *Moreno* test in *Coleman*, 26 M.J. at 409, and we will apply it in the instant case.

The Government argues on appeal that neither of the first two criteria has been met. It suggests that the communication was not in the nature of a confession or formal act of conscience. Moreover, it argues that the appellant was speaking to the chaplain in his role as a "social worker," a mere referral service through whom he hoped to obtain help for his problems. As the trial and defense counsel agreed during their arguments on the motion, however, we have no trouble finding that this discussion concerned a matter of conscience and that the appellant sought out the chaplain in his role as a spiritual adviser. *See* Record at 37, 39. They met together during a scheduled appointment in the chaplain's office, while he was wearing the cross on his collar, and discussed matters of conscience with obvious religious overtones. While the testimony at trial did not establish that the two prayed together, the appellant sought or received absolution, or there was any other particular religious formality or content, absent strong

evidence to the contrary, a servicemember who meets with the chaplain under these circumstances makes the communication as an apparent act of conscience or contrition while the chaplain is in his role as a spiritual adviser. *See generally United States v. Richards,* 17 M.J. 1016, 1019–20 (N.M.C.M.R.1984)(noting that an accused's admissions to a chaplain were privileged because they involved a "matter of conscience"; however, the accused waived the privilege when he agreed that the chaplain should discuss the matter with the legal officer). That was certainly the situation here: the military judge found that Lieutenant B[ ] was a clergyman and that the communication fell within the ambit of Military Rule of Evidence 503. Record at 42. We find that the first two prongs of the *Moreno* test were met. *See Moreno,* 20 M.J. at 626.

Although it was a closer call, we find that the third prong was met as well. The military judge determined that both the appellant and chaplain intended the matter to be confidential when they first met. Record at 42. However, he found that once the chaplain explained the "ground rules," that he would have to report any information concerning the appellant's plans to hurt himself or another, the mantle of confidentiality, and his entitlement to claim the privilege under Military Rule of Evidence 503, were lost. Record at 42–43. Interestingly, both counsel for the Government and the appellant agreed during oral argument before this court that both parties intended the discussion to be "confidential" within the meaning of Military Rule of Evidence 503 and *Moreno.* The theories of why this was so varied, however, from the ones originally articulated at trial and in the appellate briefs. We will turn to a discussion of that key issue now.

Military Rule of Evidence 503 further provides: "A communication is 'confidential' if made to a clergyman in the clergyman's capacity as a spiritual adviser ... and is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the purpose of the communication...." MIL.R.EVID. 503(b)(2). While other rules regarding testimonial privileges set out various exceptions, *see* MIL.R.EVID. 502(d) (lawyer-client), 504(c) (husband-wife), and 507(c) (identity of informant), the privilege governing communications to clergy includes no such list. Therefore, once the facts establish the three-part test articulated in *Moreno,* the privilege is absolute.

Although it was never articulated in precisely this way, both the appellant and the chaplain understood that the confidentiality of the communications would be preserved to the greatest extent possible, but that the chaplain would make further disclosure as necessary to carry out what the appellant was seeking when he came in to see the chaplain. *See In re Grand Jury Investigation,* 918 F.2d 374, 384–85 (3d Cir.1990)(holding that clergy-penitent privilege applied in statements made during family counseling sessions conducted by Lutheran minister with others present). This included getting help for his spiritual and emotional problems and protecting himself and others from possible harm. Since the appellant had revealed his plans to shoot others and then kill himself with his weapon while on the rifle range, it made sense that his rifle card be taken away and that he would be placed under observation around-the-clock.

The appellant agreed to this further disclosure for the limited purpose of getting help and preventing him from carrying out his threats. Therefore, his statements fell directly within the expansive definition of a "confidential communication" under Military Rule of Evidence 503(b)(2). Stated another way, the "ground rules" which the chaplain explained to the appellant did not extend to waiving confidentiality such that the chaplain could testify against him at a court-martial. We hold that the military judge should have granted the appellant's motion to prevent the chaplain from disclosing, during this special court-martial proceeding, the details of this confidential communication.

To conclude otherwise would largely destroy the effectiveness of members of the Chaplain Corps. Navy chaplains play a vital role in carrying out the mission of the Navy and Marine Corps. Fleet Admiral Chester A. Nimitz, U.S. Navy, expressed their importance as follows:

By patient, sympathetic labors with the crew, day in, day out, and through many a night, every chaplain I know contributed immeasurably to the moral courage of our fighting men.... Most of it was necessarily secret between pastor and confidant. It is for that toil, in the cause both of God and country, that I honor the chaplain most.

To carry out their mission of providing spiritual and moral guidance and succor during times of personal crisis, military chaplains must develop and keep the trust of those they serve.[3] This is a long-standing concern. *See, e.g., United States v. Henderson,* 11 C.M.A. 556, 563–64, 29 C.M.R. 372, 379–80, 1960 WL 4521 (1960)(noting that the chaplain had properly refused to answer a question about a communication he had received from the accused, even though the law officer directed him to do so, because "an answer would discredit the traditionally confidential nature of relations between chaplains and enlisted men...."). Part of the 1994 "Code of Ethics" for military chaplains provides: "I will hold in confidence any privileged communication received by me during the conduct of my ministry. I will not disclose confidential communications in private or in public."[4] Among other duties, chaplains must "safeguard the privileged communication of servicemembers...." Secretary of the Navy Instruction 1730.7A of 2 Sept. 1993, subj: Religious Ministries Within the Department of the Navy, encl. (1), ¶ 1(h)(3). Our higher court has observed: "Military law is not insensitive to the needs of servicemembers for chaplains and spiritual guidance...." *Coleman,* 26 M.J. at 409.

Much of what is communicated to clergymen during counselling sessions are feelings of frustration and anger at others with or under whom the Sailor or Marine works. A chaplain must confront the animosity before he can help the penitent understand and resolve it. If those who are battling loneliness and resentment feel that their chaplains will have to testify against them about some or all of what they have revealed in confidence, they are likely to avoid going to them for solace. Unresolved animosity is certainly more likely to result in violence than if the chaplain and the servicemember are able to talk it out in private. The effectiveness of the clergyman-penitent relationship will be eviscerated if the chaplain is perceived as an investigative arm of or otherwise in league with the military justice system.[5]

Of course, when balanced against a potential murderous and suicidal rampage, such as the one the appellant revealed to the chaplain that he was contemplating, preserving the confidence of the communication would pale in the minds of most. However, chaplains are hardly impotent to do anything constructive when they learn from a Sailor or Marine in confidence about his or her plans to commit suicide, an act of violence against another, or any other criminal undertaking. The chaplain's most effective tool is that the penitent, who is "heavy laden" with the burden of the pain of these thoughts,[6] is listening carefully for solace and guidance.

The penitent who comes to the chaplain for counseling does not normally desire to carry out the threat of harming anyone. Rather, he or she wants to resolve the anguish by getting help, first from the chaplain for their spiritual and moral anguish, and then from

---

**3.** At the Naval Chaplain's School in Newport, Rhode Island, the student chaplains are taught: "The breaking of a confidence destroys the effectiveness of the chaplain. Preserving a confidence in a particular situation may result in personal agony to a chaplain, but the principles of confidentiality must be guarded diligently in the interest of the religious role of the chaplain." Lesson Plan, Topic 2.12: Privileged Communication, 18 Aug. 97.

**4.** This "Code of Ethics" is part of THE COVENANT AND THE CODE OF ETHICS FOR CHAPLAINS OF THE ARMED FORCES, which the Endorsing Agents approved at the December 1994 meeting of the National Con-

ference on Ministry to the Armed Forces. This group represents the 245 religious bodies which the military services currently recognize.

**5.** In the instant case, the appellant testified that when he learned that the chaplain was going to reveal what they had discussed to others, he "felt destroyed...." Record at 13. He testified that he would never talk to a chaplain again, because "I don't trust them no more, sir." *Id.*

**6.** *See* Matthew 11:28 ("Come unto me, all ye who labour and are heavy laden, and I will give you rest.")(King James).

others as may be appropriate. After ministering to the penitent's spiritual and emotional needs, in most cases the chaplain will be able to convince the penitent to voluntarily cooperate with other caregivers and those in the chain-of-command. In cases where the servicemember appears intent upon carrying out a destructive act upon leaving the office, the chaplain must take more direct measures, other than violating the confidence, to prevent the harm.[7] In extreme cases, this may entail personally accompanying the penitent until the chaplain can guarantee that no harm will result.

In the instant case the chaplain quite properly asked the appellant whether he would be willing to have him discuss with other persons some of the matters the appellant shared with him for the purpose of getting the appellant the help that he wanted and needed. Indeed, the appellant specifically agreed to such disclosures. The appellant properly expected that he would be able to meet with a mental-health professional and that his unit would bar him from having access to any weapons. He no doubt anticipated that reassignment or administrative separation would be forthcoming. However, the chaplain did not go on to explain that he would have to testify against the appellant at a court-martial. Had he done so, it is likely that the appellant would have refused to consent. In any case, the appellant could not have reasonably expected that what he told the chaplain would become the basis for a criminal conviction.

If a penitent is fearful that what he says to a chaplain under the mantle of confidentiality can be the basis for a court-martial, such concern would chill irreparably the trust and candor so essential when a penitent needs to discuss his or her innermost thoughts for the purpose of receiving spiritual help. Moreover, it is at least possible that, had the

appellant been told or suspected that his statements would be used against him at court-martial, he would have left the meeting with the chaplain without saying another word. It is even conceivable that he would have left the office, still agitated and frustrated, and carried out his deadly plan. In such case, the chaplain would have failed utterly.

We are sensitive to the concern that a Sailor or Marine could make irresponsible statements to the chaplain for the purpose of avoiding a deployment or hazardous mission. Of course, the command chaplain does not normally have the authority to control duty assignments. Moreover, the chaplain has available to him or her other resources, including health-care professionals, to diagnose disqualifying mental or physical conditions. Finally, chaplains are not naive; they learn very quickly to spot frauds and shirkers. If a Sailor or Marine makes statements for the purpose of avoiding unpleasant duty, the command can determine whether it is appropriate to undertake criminal proceedings for the crimes of malingering or orders violations. However, the command cannot normally take the communications the appellant made to the chaplain in confidence to support criminal charges. The concern of Military Rule of Evidence 503 is that the chaplain must not become a witness against an accused for communications he has made under the mantle of the clergy-penitent privilege.

We hold, therefore, that the provisions of Military Rule of Evidence 503 applied such as to bar the communications the appellant made to the chaplain from coming into evidence against him over a timely motion to suppress. The military judge erred in admitting the evidence. Since the Government had no other evidence of the appellant's guilt of the offense,[8] we set aside the findings of

---

7. For example, a boiler technician, concerned that his wife will commence an extramarital affair while he is deployed, may confide in the chaplain that he intends to sabotage the main feed pump to prevent the ship from getting underway. Even if he were unsuccessful in dissuading the Sailor from carrying out his plan, the chaplain could, no doubt, convince the commanding officer to put the individual under guard or transfer him ashore. These steps could

be taken without revealing the details of the communication.

8. We are aware, of course, that the appellant took the stand on his own behalf and largely supported the chaplain's testimony. However, this was to try to establish his theory that when he made the statements he had no "present determination or intent to wrongfully injure" anyone else. Manual for Courts-Martial, United

guilty and the sentence, and dismiss the charge and specification with prejudice.

Senior Judge LUCAS and Judge LEO concur.

STATES (1995 ed.), Part IV, ¶ 110b(1). Had the chaplain not testified, the Government would have had no case. We are unwilling to conclude that the appellant waived the privilege by volun- tary disclosure under Military Rule of Evidence 510. At the time the military judge ruled incorrectly on the appellant's motion, the appellant had not waived the privilege.