UNITED STATES, Appellee

v.

Justin S. SHELTON, Sergeant
U.S. Army, Appellant

No. 04-0359

Crim. App. No. 9901201

United States Court of Appeals for the Armed Forces

Argued March 15, 2005

Decided September 22, 2006

GIERKE, C.J., delivered the opinion of the Court, in which
EFFRON, BAKER, and ERDMANN, JJ., joined.  CRAWFORD, J., filed a
dissenting opinion.

Counsel

For Appellant:  Captain Danyele M. Jordan (argued); Colonel
Robert D. Teetsel, Colonel Mark Cremin, Lieutenant Colonel Mark
Tellitocci, and Major Sean S. Park (on brief).

For Appellee:  Captain Abraham F. Carpio (argued); Colonel
Steven T. Salata, and Lieutenant Colonel Mark L. Johnson (on
brief); Captain Janine P. Felsman.

Military Judge:  Stephen V. Saynisch


**This opinion is subject to revision before final publication.**

Chief Judge GIERKE delivered the opinion of the Court.

In the military justice system, the clergy privilege is "[o]ne of the most sacred privileges."[1]  This privilege "'recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return.'"[2]  Military Rule of Evidence (M.R.E.) 503 allows a person to prevent disclosure of a qualified confidential communication to a member of the clergy. Specifically, the clergy privilege allows an accused "to prevent another from disclosing a confidential communication by the [accused] to a clergyman or to a clergyman's assistant, if such communication is made either as a formal act of religion or as a matter of conscience."[3]

Appellant asserts that the military judge erred by denying the defense motion to suppress the evidence arising from Appellant's communications with his pastor, Reverend (Rev.) Ronnie Dennis, because these communications were within the clergy privilege.  For the reasons explained below, we agree

---

[1] United States v. Benner, 57 M.J. 210, 212 (C.A.A.F. 2002). See, e.g., United States v. Isham, 48 M.J. 603, 606-07 (N-M. Ct. Crim. App. 1998) (discussing the importance of the clergy privilege to clergy keeping the trust of servicemembers and carrying out their mission of providing spiritual and moral guidance).
[2] Benner, 57 M.J. at 212 (quoting Trammel v. United States, 445 U.S. 40, 51 (1980)).
[3] M.R.E. 503(a).

United States v. Shelton, No. 04-0359/AR

with Appellant that his communications to Rev. Dennis were privileged and that Appellant should have been able to prevent disclosure of them.

We evaluate the impact of this error in the context of Appellant's conditional guilty plea, entered pursuant to Rule for Courts-Martial (R.C.M.) 910(a)(2). Consistent with this rule, the pretrial agreement establishes that Appellant reserved the right to withdraw his guilty plea if he prevailed on appeal in asserting that the military judge erred in denying the defense motion to suppress. As we conclude that the military judge erred and Appellant has prevailed on appeal on the clergy privilege issue, we afford Appellant the right to withdraw his guilty plea.[4]

---

[4] This Court granted review on Issue I and specified Issue II as follows:

    I. WHETHER THE UNITED STATES ARMY COURT OF CRIMINAL APPEALS ERRED IN UPHOLDING THE RULING OF THE MILITARY JUDGE THAT DENIED THE DEFENSE MOTION TO SUPPRESS ANY EVIDENCE OBTAINED AS A RESULT OF COMMUNICATIONS BETWEEN APPELLANT AND HIS PASTOR.

    II. WHETHER THE UNITED STATES ARMY COURT OF CRIMINAL APPEALS APPLIED THE CORRECT APPELLATE TEST FOR DETERMINING MATERIALITY WITH RESPECT TO THE ERRONEOUS NONDISCLOSURE OF DISCOVERABLE EVIDENCE. SEE UNITED STATES V. ROBERTS, 59 M.J. 323 (C.A.A.F. 2004).

United States v. Shelton, 60 M.J. 314 (C.A.A.F. 2004). Because we rule for Appellant on Issue I, we need not reach Issue II.

We heard oral argument in this case at the Marine Corps Base, Quantico, Virginia, as part of the Court's "Project

3

BACKGROUND[5]

Over a period of several months, the four-year-old stepdaughter of Appellant made ambiguous statements and exhibited unusual behavior that raised concerns in Appellant's wife about Appellant's possible improper sexual activity with her daughter. On June 6, 1999, the child told her mother of specific sexual contact with Appellant resulting from Appellant instructing her to kiss him in the groin area. Appellant's wife questioned Appellant about his interaction with his stepdaughter. Appellant denied any impropriety.

But Appellant's wife remained concerned, and she called their family pastor, Rev. Dennis, to discuss her suspicions that

---

Outreach." See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to demonstrate the operation of a Federal Court of Appeals and the military justice system.

[5] The lower court opinion presents the background of this case:

> A military judge sitting as a general court-martial convicted appellant, pursuant to his guilty plea, of indecent acts upon a female under sixteen years of age (three specifications), in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 [hereinafter UCMJ]. The military judge sentenced appellant to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to Private E-1. The convening authority waived automatic forfeitures required by Article 58b, UCMJ, for six months and directed payment to appellant's spouse. After the six-month waiver of forfeitures had elapsed, the convening authority approved the sentence as adjudged.

United States v. Shelton, 59 M.J. 727, 728 (A.F. Ct. Crim. App. 2004). The lower court affirmed the findings and the sentence. Id. at 736.

Appellant may have sexually abused his stepdaughter. Rev. Dennis was a civilian, ordained Protestant minister, and head minister at the New Testament Christian Church. Appellant and his wife had been attending this church for approximately two years, but they had known Rev. Dennis since 1993. They had met Rev. Dennis during a previous assignment, and he had provided counseling and assistance on a variety of subjects, including family finances, budgeting, and other personal family matters. Rev. Dennis agreed to meet with Appellant to discuss this serious allegation of sexual abuse. As a result, Appellant's wife told him to go to the pastor's office at their church the following evening to speak to Rev. Dennis.

When Appellant arrived at the church office for his appointment, another pastor, Rev. Virgo, was waiting with Rev. Dennis. In a private conference, Appellant met with both pastors, but Rev. Dennis exclusively controlled the counseling session. Rev. Virgo was present because it was the church custom to have another person present during this type of counseling. Appellant's contact with the two pastors began with one of them saying a brief prayer asking for God's wisdom and guidance in counseling before the session began.

Rev. Dennis testified that he then said to Appellant, "Your wife told me something and I want to know if you did it because it's serious and you can go to jail for it . . . ." Rev. Dennis

also told Appellant, "You claim to be a Christian, Christians don't tell lies, so I need to know."  Appellant claims that Rev. Dennis told him to tell the truth because God would judge him for lying but would have mercy on him if he told the truth. Despite these different versions of what Rev. Dennis said, there is no disagreement that Appellant confessed to sexual abuse. But the record does not reveal the specifics of Appellant's admission of child sexual abuse.  Rev. Dennis recalled Appellant lamenting, "I believe it's too late.  I don't think God can help me any longer."  Rev. Dennis consoled Appellant by assuring him, "God can help you with this."

After Appellant regained his composure, Rev. Dennis asked Appellant to get his wife and bring her to join them.  Rev. Dennis assured him that there was still hope to work through this crisis but that Appellant needed to start by telling the truth.  Appellant went to his house and immediately drove his wife to the church office.

There Appellant and his wife joined Rev. Dennis and Rev. Virgo.  Appellant claimed that he sat silently while Rev. Dennis told Appellant's wife that Appellant had done as she suspected. But Rev. Dennis did not say expressly that Appellant had molested his stepdaughter or give any details.  Rev. Dennis testified that Appellant told his wife, "I did it.  I did it. I'm wrong.  I did it."

6

At the conclusion of the consultation, Rev. Dennis told Appellant and his wife that the laws of Washington state required that he report the child sexual abuse.  It does not appear in the record that Rev. Dennis ever made this report.[6]

A couple of weeks after Appellant's counseling session with Rev. Dennis, Appellant's wife saw Rev. Dennis at church.  Rev. Dennis told her that she should report the child sexual abuse and that he would report it if she did not.  Eventually, Appellant's wife contacted Ms. Sandi Doyle, a social worker, and told Ms. Doyle about her daughter's accusations.  Investigation into this case continued with involvement of the Criminal Investigation Division (CID).  Appellant complied with an order to report to the CID office.  After being properly advised of his rights, Appellant told an investigator essentially the same thing he had told Rev. Dennis -- that he had inappropriate contact with his stepdaughter.  But CID's contact with Rev. Dennis was initially futile as Rev. Dennis refused to speak to Ms. Doyle or CID without the express written consent of Appellant or his wife.  Rev. Dennis never provided a pretrial statement to CID.  As the investigation continued, Appellant

---

[6] Even if Appellant's communications to Rev. Dennis were confidential under Washington state law and he could not testify as to the contents of Appellant's statements in court, Rev. Dennis was not prohibited from voluntarily reporting Appellant's admissions to protect an abused child.  State v. Glen, 62 P.3d 921, 928 n.7 (Wash. Ct. App. 2003).

made incriminating statements to Ms. Doyle and later to a

psychotherapist, Mr. Michael Comte.  In the latter statement,

Appellant presented a detailed explanation of his sexual

interest in his stepdaughter.  The investigation eventually

resulted in Appellant being charged with three specifications of

indecent acts upon his minor stepdaughter.

Prior to the commencement of the court-martial, Appellant

negotiated a pretrial agreement in which he agreed to

conditionally plead guilty to all three offenses.  The term of

the pretrial agreement most relevant to this appeal permitted

Appellant to attempt to exclude from the court-martial any

evidence relating to Appellant's conversation with his pastors

and to preserve this issue for appellate review.  It provided in

part:

> [2]b.  I understand that this is a conditional guilty
> plea under R.C.M. 910(a)(2), and that I reserve the
> right to appeal any adverse determinations made by the
> military judge of any of the pretrial motions made at
> my court-martial.  I understand that if I prevail on
> further review or appeal, I shall be allowed to
> withdraw my pleas of guilty.

When the court-martial began, Appellant took action to

preserve issues for appellate review and attempted to avail

himself of this term in the pretrial agreement.  Trial defense

counsel made pretrial motions[7] including a motion to suppress evidence resulting from his confidential communication to Rev. Dennis.

After an evidentiary hearing where Appellant and Rev. Dennis presented conflicting testimony regarding the nature and substance of the conference at the church, the military judge denied the defense motion and explained his ruling on the record. Almost nine months later, on September 5, 2000, the day he authenticated the record of trial, the military judge made his formal written ruling on the motion to suppress.

In both the record of his oral explanation and the later written ruling, the military judge stated that he chose to believe Rev. Dennis's recollection of events rather than Appellant's. It is the testimony of Rev. Dennis that is the primary basis for the military judge's finding of historical facts. Reflecting the testimony of Rev. Dennis, the military judge's historical findings of fact detailed the religious context in which Appellant made his statements. This included the following: Appellant made the statements to his pastor, the counseling session began with prayer, and "[t]his church was a focal point in the Sheltons['] social, spiritual, and community lives."

---

[7] The defense also made a motion to compel discovery of documents removed from the CID file. That motion related to Issue II, which we do not address at this time.

In his conclusions, the military judge made four distinct points:  (1) that Appellant did not speak to Rev. Dennis in his capacity as a clergyman or spiritual advisor; (2) that Appellant did not intend his statement to Rev. Dennis be confidential; (3) that Appellant did not make his statements as a matter of conscience; and (4) that Appellant did not make his statements as a formal act of religion.

After losing his pretrial motions, Appellant pled guilty under the provisions of the pretrial agreement.  During the Care inquiry,[8] the military judge reviewed the terms of the pretrial agreement with Appellant and specifically addressed Appellant's conditional guilty plea.  The military judge offered the following illustration of the effect of the conditional guilty plea provision:

> So let's say that the appellate court says that I'm
> all wrong about this privilege business, the motion,
> in other words, that we discussed yesterday, and they
> say that I am wrong and it should be reversed, then by
> the terms of this paragraph 2a -- 2b, I should say,
> when you've got -- or I get that notice, if it ever
> comes, then you can say hey, I changed my mind, I want
> to plead [not] guilty and withdraw your plea of
> guilty.

Satisfied that Appellant's plea was provident, the military judge accepted Appellant's guilty plea, found him guilty of all offenses, and later sentenced Appellant for his offenses.

---

[8] The military judge conducted the providence inquiry required by United States v. Care, 18 C.M.A. 535, 40 C.M.R. 247 (1969).

10

DISCUSSION

1.  Applicability of the clergy privilege

Appellant claims that he confided in Rev. Dennis, his spiritual advisor, searching for help and solace for his abusive behavior of his stepdaughter.  He alleges that the military judge erred by admitting testimony related to his disclosures to Rev. Dennis in violation of the clergy privilege of M.R.E. 503.  Since Appellant is attempting to claim the clergy privilege, he has the burden of establishing that his conversation was privileged under M.R.E. 503.[9]

In the military justice system, the clergy privilege has been recognized since at least 1949.[10]  But the present privilege in M.R.E. 503 was adopted in 1980 in conjunction with the President's issuance of the Military Rules of Evidence.[11]

This Court has recognized the importance of the clergy privilege stating, "Military law is not insensitive to the needs of servicemembers for [clergy] and spiritual guidance, and it

---

[9] See United States v. Napoleon, 46 M.J. 279, 285 (C.A.A.F. 1997); R.C.M. 905(c).

[10] See Manual for Courts-Martial, United States para. 151(b)(2) (1969 rev. ed.) (MCM); MCM para. 151(b)(2) (1951 ed.); Manual for Courts-Martial, U.S. Army para. 137b (1949 ed.).  Earlier manuals were silent as to the clergy privilege.  See United States v. Coleman, 26 M.J. 407, 409 n.3 (C.M.A. 1988).

[11] See Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app. 22 at A22-39 (2005 ed.) [hereinafter M.R.E. Drafters' Analysis].

has long recognized the 'penitent and clergyman' privilege."[12] The privilege reflects respect for the traditional confidential nature of relations between clergy and servicemembers.[13]

M.R.E. 503(a) expressly recognizes a clergy privilege and provides: "A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman or to a clergyman's assistant, if such communication is made either as a formal act of religion or as a matter of conscience."[14] M.R.E. 503(c) broadly extends the privilege to allow either the communicant or the clergy member to claim the privilege.[15]

---

[12] Coleman, 26 M.J. at 409.

[13] See United States v. Henderson, 11 C.M.A. 556, 564, 29 C.M.R. 372, 379-80 (1960) (explaining a chaplain's reason for refusing to disclose a communication with a servicemember). See generally Isham, 48 M.J. at 605 (discussing the ethical duty of chaplains to hold in confidence privileged communications).

[14] "Furthermore, this privilege is recognized in paragraph 4-4 of Army Regulation 165-1, Chaplain Activities in the United States Army (26 May 2000) (superseding 27 Feb. 1998), and paragraph 3-8 of Army Regulation 608-18, The Family Advocacy Program (1 September 1995)." Benner, 57 M.J. at 212.

[15] This is not the only privilege available for a servicemember to obtain confidential counseling. In M.R.E. 513 the President adopted a psychotherapist-patient privilege for the military justice system. "The rule allows a patient the privilege to refuse to disclose, or allow another to disclose, a confidential communication between the patient and a psychotherapist." United States v. Clark, 62 M.J. 195, 199 (C.A.A.F. 2005). This rule is "'based on the social benefit of confidential counseling recognized by Jaffee [v. Redmond, 518 U.S. 1 (1996)], and similar to the clergy-penitent privilege.'" Id. (quoting M.R.E. Drafters' Analysis app. 22 at A22-44 (2000 ed.)).

This Court has addressed the evidentiary foundation of this privilege in a variety of cases.[16]  M.R.E. 503 has three components pertinent to the present case:  (1) the communication must be made either as a formal act of religion or as a matter of conscience; (2) it must be made to a clergyman in his capacity as a spiritual advisor or to his assistant in his official capacity; and (3) the communication must be intended to be confidential.  We must evaluate whether Appellant has established these three criteria necessary to claim the privilege.

The focus of our analysis is the ruling of the military judge.  When reviewing a decision of a Court of Criminal Appeals on a military judge's ruling, "we typically have pierced through that intermediate level" and examined the military judge's ruling, then decided whether the Court of Criminal Appeals was right or wrong in its examination of the military judge's ruling.[17]

We review a military judge's decision to admit evidence for an abuse of discretion.[18]  Whether a communication is privileged

---

[16] See, e.g., Napoleon, 46 M.J. at 283-85; Coleman, 26 M.J. at 409-10.

[17] See United States v. Siroky, 44 M.J. 394, 399 (C.A.A.F. 1996).

[18] United States v. McCollum, 58 M.J. 323, 335 (C.A.A.F. 2003) (citing United States v. McElhaney, 54 M.J. 120, 132 (C.A.A.F. 2000)).

is a mixed question of fact and law.[19]  We will give the military

judge's findings of fact deference, reversing such findings only

if they are clearly erroneous, while we review the legal

conclusions de novo.[20]

Although the clergy privilege, like all privileges must be

strictly construed,[21] it is legal error when the privilege is

misconstrued.[22]  Applying the three criteria of M.R.E. 503, we

conclude that the military judge erred as a matter of law in

concluding that Appellant's communication with Rev. Dennis was

not a matter of conscience.

Our application of the law to the facts of this case begins

with the threshold for claiming the privilege, that is, whether

Appellant confided in Rev. Dennis "either as a formal act of

religion or as a matter of conscience."[23]  For purpose of our

analysis, we will assume that Appellant did not confess "as a

formal act of religion."  But this concept is distinguishable

from whether Appellant confessed as "a matter of conscience."[24]

An "act of religion" must comply with the particular tenets of a

---

[19] Id. at 335-36.
[20] Id. at 336 (citing United States v. Ayala, 43 M.J. 296, 298 (C.A.A.F. 1995)).
[21] Trammel, 445 U.S. at 50.
[22] See Napoleon, 46 M.J. at 284-85.
[23] M.R.E. 503(a) (emphasis added).
[24] See generally Isham, 48 M.J. at 605-06 (holding that the appellant's discussion with the chaplain concerned a matter of conscience); United States v. Richards, 17 M.J. 1016, 1019-20 (N.M.C.M.R. 1984) (finding an appellant's admissions involved a "matter of conscience").

faith, but a "matter of conscience" is privately held within a person.

The military judge erred by not focusing on the religious context under which Appellant's statements were made. Most importantly, Rev. Dennis used the authority of his religion to induce Appellant to confess. Rev. Dennis testified about the religious atmosphere surrounding their conversations. Rev. Dennis testified that he began the counseling session with a prayer to ask for God's guidance. Rev. Dennis admitted that he told Appellant, "You claim to be a Christian, Christians don't tell lies. . . ." Also, at the end of their meeting before Appellant's wife joined them, Rev. Dennis told Appellant that "God can help you with this." Rev. Dennis testified that "[Appellant's] attitude has always been one that has accepted his guilt and what he has done and [he was] really crying out for help." Rev. Dennis further explained that he was trying to give Appellant "some kind of avenue of hope as a pastor in counseling so that he would not hurt himself."

These facts establish the religious context under which Appellant made his statements to Rev. Dennis. These circumstances burdened Appellant's conscience, and following the advice of his pastor, Rev. Dennis, Appellant confessed. We note that the past secular discussion between Appellant and Rev. Dennis related to financing, budgeting, and family matters. But

there is nothing in the record to establish that these counseling sessions were as spiritually charged as the counseling involved in the present case.  The mere prior counseling contact between Rev. Dennis and Appellant on other matters does not preclude a conclusion that, in the present instance, Appellant's communication with Rev. Dennis was a matter of conscience.  Accordingly, we conclude that the military judge erred in failing to find that Appellant confessed to Rev. Dennis as a matter of conscience.

We further hold that the communication was "made to a clergyman in his capacity as a spiritual advisor" as required by M.R.E. 503.  Respecting all the faiths in our increasing pluralistic society, this Court has recognized that the scope of privileged protection in M.R.E. 503 is a large circle.  We have stated:

> [M.R.E.] 503(b)(1) defines "clergyman" as "a minister, priest, rabbi, chaplain, or other similar functionary of a religious organization, or an individual reasonably believed to be so by the person consulting the clergyman." [M.R.E.] 503 is similar to proposed Fed. R. Evid. 506, which was not adopted.  The Advisory Committee Note on the proposed federal rule indicates that "clergyman" was intended to mean a person "regularly engaged in activities conforming at least in a general way with those of a Catholic priest, Jewish rabbi, or minister of an established Protestant denomination." [25]

---

[25] Napoleon, 46 M.J. at 284 (citing 2 Stephen A. Saltzburg & Michael M. Martin, Federal Rules of Evidence Manual § 601-02 (5th ed. 1990), and Stephen A. Saltzburg, Lee D. Schinasi & David A. Schlueter, Military Rules of Evidence Manual § 557 (3d ed. 1991)).

There is no dispute between the parties that Rev. Dennis qualifies as a "clergyman" under M.R.E. 503(b)(1), as he is an ordained minister and head pastor of the New Testament Christian Church. Appellant attended Rev. Dennis's church for approximately two years, recognized him as his pastor, and talked to him at the church in his capacity as a clergyman. Again, we consider the circumstances of Rev. Dennis beginning the meeting with prayer, the fact that the counseling session occurred at the church, and the religious atmosphere and spiritual language of the meeting as critical facts establishing that Appellant's communication with Rev. Dennis was in the clergy's official capacity.

Finally, the record establishes that Appellant intended his communications to be confidential. This Court focuses on Appellant to make this determination.[26] At the motion hearing, Appellant asserted that he intended that the conversation remain confidential. He testified that he did not want his wife to know what he revealed to Rev. Dennis. Appellant explained that since Rev. Dennis was "the spiritual leader of our church and . . . he wanted to talk to my wife, I -- I didn't see why I should tell him no, not to meet with her."

---

[26] Coleman, 26 M.J. at 409 (agreeing with United States v. Moreno, 20 M.J. 623, 627 (A.C.M.R. 1985).

17

We acknowledge that Rev. Dennis testified that he had told his congregation that he would not keep confidential confessional communications regarding child abuse. But whether or not Appellant was present when Rev. Dennis made these statements is not as important as the religious context established by Appellant's private meetings with Rev. Dennis. The specific circumstances of these private meetings support Appellant's reasonable expectation that the counseling was indeed confidential.

Moreover, Rev. Dennis told Appellant that it was important that his wife be present and that Appellant needed to tell his wife because he had lied to her. Rev. Dennis also instructed Appellant, "You need to stand up and tell her the truth of what happened." Appellant followed the advice of his spiritual advisor. Since Rev. Dennis believed that Appellant's wife's presence was necessary for his redemption, Appellant brought his wife into the room where she learned that Appellant had been sexually abusing his stepdaughter. And, "[a]s is the case with the attorney-client privilege, the presence of third parties, [which is] essential to and in furtherance of the communication, does not vitiate the clergy-communicant privilege."[27]

---

[27] In re Grand Jury Investigation, 918 F.2d 374, 377 (3d Cir. 1990).

We need not presently define the precise parameters of preserving this privileged communication made in the presence of third parties. It is sufficient here to conclude that this privilege is preserved where there is a "relationship by blood or marriage" as well as a "commonality of interest" between the accused and the third party present during the privileged communications.[28] Both these factors are present here as the third party present was Appellant's wife who had played the pivotal role of sending Appellant to Rev. Dennis in the first instance.

Finally, we observe there was only a short break in time between Appellant's first statement to Rev. Dennis and Appellant's second statement, made in the presence of Appellant's wife. We view the time for Appellant to obtain his wife and return to the church and continue his conversation with Rev. Dennis so short that it did not affect Appellant's expectation of confidentiality in the counseling session with his pastor.

In summary, we conclude that the record establishes the three-prong evidentiary foundation for the clergy privilege in this case. Appellant communicated his guilt to Rev. Dennis, Appellant's pastor. Appellant's communication was made as a matter of conscience, and Appellant intended their communication

---

[28] Id. at 385-88.

19

to remain confidential.  Because M.R.E. 503 grants Appellant a right to keep this privileged conversation confidential, we conclude that the military judge abused his discretion by ruling that Appellant's statements to his pastor were not privileged and would be otherwise admissible evidence.

As we conclude that the military judge made an evidentiary error, normally we would now address whether this error was harmless.[29]  In doing so we would consider other evidence that implicated Appellant, including his incriminating statements to both the social worker, Ms. Doyle, and the psychotherapist, Mr. Comte.  But that avenue of analysis is not presently open because of the context of this error in the trial proceedings. We now address the impact of this error on Appellant's conditional guilty plea.

2.  Impact of the error regarding privilege on Appellant's conditional guilty plea

R.C.M. 910(a)(2) permits an accused to enter a conditional plea of guilty, which reserves "the right, on further review or appeal, to review of the adverse determination of any specified pretrial motion."

Consistent with the procedural rule, Appellant's pretrial guilty plea agreement specifically reserved "the right to appeal

---

[29] Kotteakos v. United States, 328 U.S. 750, 765 (1946).

any adverse determinations made by the military judge of any of the pretrial motions made at [his] court-martial."

Appellant availed himself of the R.C.M. 910(a)(2) procedural rule and the express terms of his pretrial agreement. Appellant conditionally pled guilty to the charges. By doing so, Appellant preserved his right to challenge the ruling of the military judge notwithstanding his guilty plea.

R.C.M. 910(a)(2) also states, "If the accused prevails on further review or appeal, the accused shall be allowed to withdraw the plea of guilty." Reflecting this provision, the pretrial agreement further stated, "I [Appellant] understand that if I prevail on further review or appeal, I shall be allowed to withdraw my pleas of guilty."

The military judge's denial of the defense's motion to suppress Rev. Dennis's statements was a determination adverse to the defense and therefore covered by the terms of the conditional guilty plea.[30] As we conclude that the military

---

[30] The military judge's explanation to Appellant made clear that Appellant would have the option of withdrawing from his guilty plea if the military judge's ruling on the privilege was reversed on appeal. We note that the lower court assumed "that if the defense had succeeded in suppressing any of [the evidence], appellant could have withdrawn his guilty plea." Shelton, 59 M.J. at 728.

judge erred in denying the defense's motion, Appellant is entitled to the opportunity to withdraw his plea of guilty.[31] This is the only appropriate remedy available to address the military judge's erroneous evidentiary ruling in the context of a conditional guilty plea.  In United States v. Barror,[32] we explained that the necessity of this remedy arises from the government relying on an appellant's conditional guilty plea to satisfy its burden:

> Of course in the instant case, since appellant candidly confessed his guilt to the offense after losing the motion, we are not, ultimately, concerned about the reliability of [the victim]'s statement.  Rather, what is at stake is the ability of an accused to put the Government to its burden of proving him guilty, beyond a reasonable doubt, using only legally competent evidence.  As the evidence available to the Government did not meet that criterion, appellant is entitled, in accordance with his agreement with the Government and under the provisions of the Manual, to withdraw his plea of guilty.[33]

As this precedent illustrates, R.C.M. 910(a)(2) preserves and protects the Appellant's right to make the Government prove its case with admissible evidence.[34]  Honoring this fundamental

---

[31] See United States v. Barror, 23 M.J. 370, 373 (C.M.A. 1987) (holding that the military judge erred in denying the defense's motion to suppress the victim's pretrial statement, upon which the appellant's guilty plea was conditioned, and allowing the appellant to replead to the affected specification in the event of a rehearing).

[32] Id.

[33] Id. at 373 (emphasis added).

[34] Our reliance on Barror in no way suggests that Appellant must establish that the Government relied on his privileged statement to prove his guilt.  Appellant entered a conditional guilty plea, and the condition occurred.  As a matter of law, in the

right, we afford Appellant his bargained for right to withdraw his pleas of guilty and obtain a rehearing.  And we do so without addressing whether or not the military judge's error might have been harmless had there been an evidentiary proceeding in a contested case.[35]

## DECISION

For all of the reasons above, the decision of the United States Army Court of Criminal Appeals is set aside.  The record of trial is returned to the Judge Advocate General of the Army for further proceedings consistent with this opinion.

---

context of this conditional guilty plea, Appellant was entitled to withdraw his guilty plea when Appellant prevailed in his appellate challenge to the evidentiary ruling.

[35] The reasoning of Barror, 23 M.J. at 373, focusing on the government's burden of proof, explains why in this case it would be inappropriate to inquire into whether Appellant's subsequent statements to Ms. Doyle and Mr. Comte are sufficiently attenuated to be admissible.  Cf. Oregon v. Elstad, 470 U.S. 298 (1985).

CRAWFORD, Judge (dissenting):

Appellant's communications with his pastor were not protected under the clergy privilege. And, even if they were, his subsequent confessions to law enforcement and social work personnel were totally independent of the statements to the pastor. Thus, I respectfully dissent from the majority's misapplication of Military Rule of Evidence (M.R.E.) 503, <u>Manual for Courts-Martial, United States</u> (2005 ed.) (<u>MCM</u>),[1] and assuming there was a violation of M.R.E. 503, its failure to follow precedent of the Supreme Court and this Court concerning the attenuation of any taint.

### BACKGROUND

Appellant's wife became suspicious of Appellant when her daughter told her "Daddy says . . . no more tongue in teeth" when kissing. Later, the child was behaving oddly and told her mother that Appellant "pointed down there and asked her to kiss" him on his genitalia area. When his wife confronted Appellant, he denied it. Mrs. Shelton then told Appellant she was going to call their pastor, Reverend (Rev.) Dennis. Shortly after the confrontation, Mrs. Shelton called Rev. Dennis for guidance.

Rev. Dennis told Mrs. Shelton to tell Appellant he wanted to talk to him and to have Appellant come to see him the

---

[1] The current versions of all <u>MCM</u> provisions cited are identical to the ones in effect at the time of Appellant's court-martial unless otherwise indicated.

following evening at 8:00 p.m.  Rev. Dennis's purpose was to find out the truth about the allegations.  Mrs. Shelton told Appellant about the meeting and he arrived as directed. Appellant acknowledged he was not seeking a meeting with Rev. Dennis and that he was responding to Rev. Dennis's direction.

Although not certain of the purpose of the meeting, Appellant suspected it was to discuss the allegations his wife raised with him regarding his stepdaughter.  Appellant realized that ultimately he would have to tell his wife what had happened with his stepdaughter, but it was not his plan to tell her at that time.  Appellant also did not plan on admitting his misconduct to Rev. Dennis at the meeting.  Appellant testified he went to the meeting because his pastor "asked to meet with [him] and [he] always went if [his] pastor ever wanted to meet with [him].  He acknowledged he could have chosen not to go to the meeting, however, he thought it would have been disrespectful to Rev. Dennis not to respond.

The meeting took place in a two-bedroom house located on the church property and routinely used as a nursery.  Rev. Dennis also used this building for meetings with church members. The area used for the meeting was set up similar to a living room with sofas.  Rev. Dennis was dressed in slacks, a dress shirt, and jacket, which was typical attire for him when not presenting a sermon.

2

When Appellant entered the room, Rev. Virgo was in the room with Rev. Dennis.[2] Rev. Dennis did not introduce Rev. Virgo to Appellant and Appellant did not question his presence. According to Appellant, it was common practice for another preacher to be present in counseling sessions.

The meeting started with Rev. Virgo leading the three men in a prayer. Immediately after the prayer, Rev. Dennis got to the point of the meeting. He told Appellant that his wife had called him and said that something very serious had happened at home. Rev. Dennis told Appellant that he wanted to know the truth and that God would judge Appellant if he lied. Appellant readily admitted he had engaged in inappropriate conduct with his stepdaughter and had fantasies of taking the contact with his stepdaughter to another level. Rev. Dennis told Appellant his conduct was wrong and that he could go to jail for this.

Rev. Dennis then told Appellant that he needed to tell his wife the truth about what had occurred with his stepdaughter. There was no discussion about why Appellant's wife needed to know the truth. He told Appellant to go get his wife and bring her back to the meeting. Appellant left the meeting, went to

---

[2] Rev. Dennis routinely trained young, inexperienced preachers in his church and had them present during meetings or other church functions. Rev. Virgo was one of the young preachers Rev. Dennis trained.

his home to pick up his wife, and returned to the meeting within fifteen to twenty minutes.

Appellant and his wife sat down in the room with Rev. Dennis and Rev. Virgo. Rev. Dennis told Appellant "you need to talk to her. Tell her exactly what happened." Appellant responded, "I did it. I did it. I'm wrong. I did it." He also stated, "that's not the way I want to be . . . ." It appears that neither Rev. Dennis nor Appellant repeated the details of Appellant's initial confession of his actions and fantasies to Appellant's wife.

During the conversations with Appellant, Rev. Dennis told the parties present that the situation was serious, it needed to be reported, something had to be done, and Appellant could go to jail. At no time did Appellant object to or oppose reporting his misconduct. Rev. Dennis told the Sheltons during the meeting that state law required clergy to report any type of crime against children.[3] At the conclusion of the meeting, Rev. Dennis proceeded to address what to do next. He expressed concern for the safety of Appellant's stepdaughter and recommended that Mrs. Shelton leave the home with her children. Mrs. Shelton said she would keep her daughter away from

---

[3] Clergy are not mandated reporters of child abuse in the state of Washington. Wash. Rev. Code Ann. § 26.44.030 (West 2003).

4

Appellant. The entire meeting process, including the time it took for Appellant to go home and pick up his wife, lasted approximately one hour and fifteen minutes. The Sheltons left the church at 9:00 p.m. or 9:15 p.m.

Even though Appellant did not want his wife to know about his actions at that time, he left the meeting, picked up his wife and brought her back to the church to talk to Rev. Dennis. Appellant said he knew his admissions would not be held confidential "when [Rev. Dennis] told my wife, and then the meeting afterwards he informed me and my wife that according to the bylaws that -- that he would have to tell the proper authorities." He also testified he was not using Rev. Dennis "to come clean" with his wife or to turn himself in for his misconduct. When Appellant decided to meet with Rev. Dennis, he did not plan or intend to acknowledge or talk about his actions with his stepdaughter.[4] Rev. Dennis confronted Appellant about the allegations raised by Appellant's wife and Appellant confessed.

Approximately two weeks later, Rev. Dennis saw Appellant's wife at church and asked if she was going to report what

---

[4] Appellant testified that "when I first went there I did not -- I did not want to tell him anything. I was not going to tell him anything, but after he made the statement to me I thought about it real quick and -- and that was when I decided to go ahead and tell him."

happened.  Rev. Dennis told her he was obligated to report it to
the proper authorities and advised her to do the same.  Rev.
Dennis never reported Appellant's misconduct to authorities.  On
June 24, 1999, Appellant's wife contacted Ms. Sandi Doyle, a
social worker at Fort Lewis.  Appellant's wife told Appellant
she had contacted Social Work Services.  Ms. Doyle contacted the
Criminal Investigative Division (CID), which contacted
Appellant's chain of command.  On June 24, 1999, Appellant was
ordered to report to CID.  After a proper rights advisement,
Appellant made a sworn statement admitting his misconduct with
his stepdaughter.[5]  The following day, Appellant went to Social
Work Services to meet with Ms. Doyle for an appointment.
Appellant talked about his actions in general terms with Ms.
Doyle.  She then set up an appointment for him with Mr. Michael
Comte, a psychotherapist.  Appellant discussed with Mr. Comte
the details of his misconduct and fantasies.  By the time the
appointment was set up with the psychotherapist, Appellant
wanted to meet with Mr. Comte to get assistance for himself.

---

[5] Special Agent (SA) Proctor of the Fort Lewis CID interviewed
Appellant on June 24, 1999, after receiving a call from Ms.
Doyle from Social Work Services.  She told CID she had
information that indicated Appellant may have committed indecent
acts with his stepdaughter.  SA Proctor did not interview or
talk to Mrs. Shelton prior to his interview with Appellant.  SA
Proctor advised Appellant of his Article 31(b), Uniform Code of
Military Justice (UCMJ), 10 U.S.C. § 831(b) (2000), rights prior
to questioning Appellant.  Appellant waived his rights and
rendered a sworn statement admitting misconduct with his
stepdaughter.

Appellant acknowledged that his communications to Mr. Comte were not connected to what he had said to CID.

## DISCUSSION

M.R.E. 503(a) provides that the holder of a privilege may "prevent another from disclosing a confidential communication by the person to a clergyman . . . if such communication is made either as a formal act of religion or as a matter of conscience." M.R.E. 503(b) defines "clergyman" and then expressly limits the term "confidential communication." "[C]ommunication is 'confidential' if made to a clergyman in the clergyman's capacity as a spiritual advisor . . . and is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the purpose of the communication or to those reasonably necessary for transmission of the communication." M.R.E. 503(b)(2).

This Court has adopted the three-prong test identified in United States v. Moreno, 20 M.J. 623, 626 (A.C.M.R. 1985),[6] to determine whether communication to a clergy is privileged and thus, protected from disclosure. One claiming the clergy privilege must establish:

> (1)  the communication must be made either as a formal act of religion or as a matter of conscience;
> (2)  it must be made to a clergyman in his capacity as a spiritual advisor or to his assistant in his official capacity; and

---

[6] United States v. Coleman, 26 M.J. 407, 409 (C.M.A. 1988).

> (3) the communication must be intended to be confidential.[7]

Applying this analysis to the facts in this case, I would not hold that a clergy privilege existed.[8] Specifically, I would not conclude that Appellant confessed his actions and fantasies to Rev. Dennis and Rev. Virgo and subsequently to his wife as a matter of conscience or that Appellant "intended" the communication to be "confidential."[9]

A MATTER OF CONSCIENCE

Appellant's confessions to Rev. Dennis, Rev. Virgo, and Mrs. Shelton do not amount to a "matter of conscience." The clergy "privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." Trammel v. United States, 445 U.S. 40, 51 (1980).

The facts in this case do not support a finding that Appellant was seeking out Rev. Dennis for any kind consolation or guidance. Appellant did not request a meeting. Rev. Dennis told Appellant to come to see him. Rev. Dennis set up the

---

[7] Moreno, 20 M.J. at 626 (emphasis added).
[8] I take issue with the majority's findings in regard to prongs one and three of the Moreno test. I do not dispute that Rev. Dennis qualifies as clergyman and served as a spiritual advisor.
[9] I agree with the majority that the facts do not support a finding that Appellant's communication was a "formal act of religion." Thus, I will not address this factor.

meeting to find out the truth of the allegations raised by Mrs. Shelton and to determine if the safety of Appellant's stepdaughter was an issue. Mrs. Shelton was the one seeking out Rev. Dennis's assistance, not Appellant. Moreover, Rev. Dennis sought out Appellant. This is not a situation where a penitent is seeking to confess his sins to obtain forgiveness or guidance. In sum, these facts do not amount to an individual seeking to talk to a member of the clergy "as a matter of conscience."

Appellant claimed he confessed because he did not "want the judgment of God" on him and he was hoping Rev. Dennis would "tell [him] how [he could] get back in favor with God, and maybe could even tell [him] someplace [he] could go to find help." However, Appellant's actions, or lack of actions, do not support Appellant's assertion that he was seeking consolation or help for repentance. During the meeting, and during the days following the meeting, Appellant did not ask for a subsequent or follow-up meeting for consolation or counseling with Rev. Dennis or other members of the clergy, nor did he seek or ask about referrals to other professionals who could help him. Further, during the meeting, Appellant did not ask for prayer for himself

or his family.[10]  He also did not ask God for forgiveness through prayer or through Rev. Dennis.  He did not ask his wife for forgiveness or promise to try to get help in dealing with his conduct and proclivities.

Appellant was not "in need."  If anyone was seeking help or consolation, it was Appellant's wife.  Mrs. Shelton was seeking help from Rev. Dennis to find out the truth from Appellant regarding her daughter's statements and actions.

None of the reasons for the applicability of the clergy privilege is present in this case.  Appellant was not seeking help or consolation from Rev. Dennis.  As the military judge correctly concluded, "the [Appellant's] motivation in agreeing to meet [Rev.] Dennis was not for the purpose of seeking the clergyman's spiritual guidance or as a matter of conscience."

COMMUNICATION MUST BE INTENDED TO BE CONFIDENTIAL

The totality of the circumstances surrounding the disclosure do not support Appellant's assertion that the conversation with Rev. Dennis was intended to be "confidential." I agree that "[w]hether a communication is confidential will depend on the intent of the person making the communication," however, a military judge or court must look at the

---

[10] According to Appellant, the Bible says that "one part of forgiveness is that we have to confess our sins while in praying to Jesus . . . ."

10

"circumstances, timing, and location of the communication" to determine the actual intent of that person.[11]

From the beginning, Rev. Dennis made it very clear the situation was serious and needed to be reported. He told both Appellant and his wife that Appellant could go to jail for his actions towards his stepdaughter. He also told Appellant he needed to tell his wife the truth and he directed Appellant to go pick her up and bring her back to the meeting. Appellant left the meeting, went home to pick up his wife, and returned to the meeting within fifteen to twenty minutes. Appellant never disputed or openly argued against "reporting" the situation or to "telling" his wife. Appellant never asked that Rev. Dennis not involve anyone else in the situation.[12] It is unreasonable,

---

[11] 2 Stephen A. Saltzburg et al., Military Rules of Evidence Manual § 502.02, at 5-25 (5th ed. 2003). See also id. § 503.01, at 5-37 ("[T]he definition [of confidential communications] turns on the penitent's intent and is broad enough to include oral and written statements if made to the clergyman in confidence for the purpose of seeking spiritual counseling. If the statements were made for non-spiritual purposes, the privilege does not exist.").

[12] Rev. Dennis testified that he "taught" all church members in open meetings that if they came to him with a matter they wanted him to keep confidential, they had to state that to him. He also specifically told the members of his church that there would be no confidentiality if a crime was committed. Appellant and his wife had been members of Rev. Dennis's church for more than two years. The Sheltons also attended a church pastored by Rev. Dennis at a previous duty assignment in Georgia. Appellant and Mrs. Shelton testified at the Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), session that they did not recall being told prior to the meeting that if a member revealed a crime to Rev. Dennis, he would not consider the communication confidential.

based on what was being said and done during the meeting to conclude that Appellant perceived his statements acknowledging misconduct amounted to "a confidential disclosure" to a member of the clergy. The fact that Appellant readily went to pick up his wife and returned to Rev. Dennis's office with her so that he could "tell" her the truth is inconsistent with Appellant's assertion that he believed his confession would not be disclosed or kept secret. Even assuming Appellant expected his conversation with Rev. Dennis and Rev. Virgo to be held in confidence, once he told his wife and allowed Rev. Dennis to tell his wife about his confessed misconduct, there was no longer a realistic expectation of privacy.

If Appellant expected or intended confidentiality, he did not say so at the time and never responded to what was being said to him by Rev. Dennis. It is clear from Rev. Dennis's comments and actions that he did not intend to keep this information confidential. Appellant never questioned or challenged this intent. Conveniently, at the Article 39(a),

_____

They also claimed they did not recall being told that they had to request the communication be held in confidence before they could expect confidentiality. Both recall Rev. Dennis discussing with them at the meeting that "by law" he was required to report the incident to authorities. There is some confusion in the testimony and in the military judge's findings as to whether Rev. Dennis believed he was required to report child abuse "by state law" or based on the "by-laws" of the church. Rev. Dennis's testimony clarifies that he is referring to state law and not church "by-laws."

UCMJ, session, Appellant testified that he believed his confession would be confidential.  This Court now finds that testimony more credible than the military judge's findings regarding Appellant's and Rev. Dennis's credibility.[13]  Contrary to Appellant's assertions at trial and the findings by the majority, the facts do not support the conclusion that Appellant was seeking to make his admission of wrongdoing confidential.

In addition, Appellant failed to establish that the presence of Rev. Virgo, and subsequently his wife, during his communications with Rev. Dennis were essential to, or in furtherance of, the purpose of the communication to a clergy member.  Generally, the existence and applicability of the clergy privilege is undermined by the presumption "that communications that take place in the presence of third parties are not confidential."  In re Grand Jury Investigation, 918 F.2d 374, 385 n.15 (3d Cir. 1990).[14]  Although the privilege may exist

---

[13] On the credibility issue, the military judge believed Rev. Dennis, rather than Appellant, and found that the "discussion[s] between [Rev. Dennis] and the accused were not meant to be confidential . . . ."  See United States v. Martinez, 38 M.J. 82, 86 (C.M.A. 1993) (military judges are in the unique position to decide the appropriate weight to give to the testimony of witnesses and when "the military judge expresses special influence of that unique viewpoint on his judgment," that should weigh heavily in the appellate court's determination).

[14] "[I]n a situation where numerous persons, each seeking individual spiritual guidance, choose to meet as a group with a clergy member, a privilege does not exist unless, upon independent scrutiny, the 'essentiality and in furtherance' test is met."  In Re Grand Jury Investigation, 918 F.2d at 386 n.19.

13

even if third persons are present or later hear the communication, the disclosure must be "in furtherance of the purpose of the communication or to those reasonably necessary for the transmission of the communication." M.R.E. 503(b)(2). The burden of proof to establish the existence of the privilege and to rebut the presumption is on the party asserting the privilege. In re Grand Jury Investigation, 918 F.2d at 385.

In this case, a third person, Rev. Virgo, was present during Appellant's initial confession to Rev. Dennis and during Appellant's admission to his wife. Appellant did not know Rev. Virgo and was not introduced to him at the time of the meeting as someone who needed to be present in order to facilitate the process or the communication. No one asked Appellant's permission to have Rev. Virgo present during his discussion with Rev. Dennis and Appellant did not voice an objection to having a person he did not know present during his conversation. Although Rev. Virgo apparently led the group in prayer as the meeting began, he did not participate in the questioning of Appellant or any counseling. He simply served as a witness to what was transpiring. Appellant had no expectation of receiving anything, including consolation from Rev. Virgo. Rev. Virgo did not further the purpose of the communication and his presence was not reasonably necessary for the transmission of the communication.

After Appellant confessed to Rev. Dennis in the presence of Rev. Virgo, Rev. Dennis told Appellant to go get his wife and bring her back. Rev. Dennis also told Appellant he should tell his wife the truth about what he did to his stepdaughter. Appellant brought his wife back to the meeting with Rev. Dennis and Rev. Virgo. At that time, Appellant acknowledged that he acted inappropriately with his stepdaughter. Making Appellant tell his wife the truth was not in "furtherance of the purpose of the communication" and was not "reasonably necessary for the transmission of the communication." See M.R.E. 503(b)(2). Telling his wife "the truth" was also not necessary for consolation or to help Appellant. And, contrary to the assertion of the majority, telling his wife was not necessary for Appellant's "redemption." There were no follow-up meetings or counseling sessions scheduled for Appellant individually, or with his wife. There were no recommendations or referrals to mental health professionals. Rev. Dennis made Appellant tell his wife the truth to confirm her suspicions about Appellant. Presumably, he also made Appellant tell his wife to prevent Appellant from committing additional misconduct with his stepdaughter and to protect her.[15] There was no other purpose

---

[15] Arguably, the purpose of the communication to Mrs. Shelton was necessary to protect Appellant's stepdaughter from further harm and exposure to Appellant. However, protection of Appellant's

15

for communicating Appellant's misdeeds to Mrs. Shelton.  In short, telling Mrs. Shelton was not to help Appellant in any way.[16]  Appellant failed to demonstrate that the communications to Rev. Virgo or his wife were in furtherance of the purpose of the communication or that their presence was necessary for the transmission.

MILITARY JUDGE'S ESSENTIAL FINDINGS

The majority believes the military judge erred in concluding that Appellant's communication with Rev. Dennis was not "a matter of conscience."  The majority opinion determined that the military judge abused his discretion because he "misconstrued" the clergy privilege and gave more weight to Rev. Dennis's opinions versus the opinions of Appellant.[17]

The military judge did look at Appellant's "opinion" and determined whether Appellant intended for the communication to be a confidential "matter of conscience."  The military judge, however, did not limit his factfinding merely to Appellant's

---

stepdaughter could have been accomplished without having Appellant confess his actions to his wife.

[16] Compare United States v. Isham, 48 M.J. 603, 607-08 (N-M. Ct. Crim. App. 1998) (Court concluded that the appellant agreed to disclosure by "a" chaplain for the limited purpose of getting help for the appellant and preventing him from carrying out threats to harm himself and others.  The disclosure was for a limited purpose of getting the appellant help and not for disclosure at a court-martial.).

[17] Appellate courts presume that military judges know the law and apply it correctly.  United States v. Raya, 45 M.J. 251, 253 (C.A.A.F. 1996); United States v. Prevatte, 40 M.J. 396, 398 (C.M.A. 1994).

words.  He looked at the credibility of the witnesses and the "circumstances, timing, and location of the communication" to make "independent conclusions" regarding the existence of the privilege.  He also looked at what was being said and done at the time of the communication to determine Appellant's actual intent.  If Appellant disagreed, or truly intended not to have his confession disclosed, he should have at least said something to that effect.  The majority relies on Appellant's spoken words during the motion hearing and what they perceive as a coercive "religious atmosphere" to determine the actual intent of Appellant.[18]

The majority finds that Appellant confessed to Rev. Dennis "as a matter of conscience" by focusing on the "religious atmosphere" surrounding the conversations, as well as Rev. Dennis's use of God to cause Appellant to feel guilt and shame and thus confess.  Accordingly, the majority equates this potentially "coercive" environment to Appellant having an intent to confess his actions and fantasies "as a matter of

---

[18] Anderson v. Bessemer City, 470 U.S. 564, 574 (1985) (If the military judge's "account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently.  Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

conscience."[19]  In his findings, the military judge clearly

looked at and considered Appellant's intent as to why he

selected this moment in time to confess and whether he was

seeking consolation, assistance, or forgiveness from his God.[20]

The military judge's findings are correct.  Appellant did not

seek to confess his misconduct as a "matter of conscience" or as

"a formal act of religion."  Appellant never spoke up or took

any actions to demonstrate a different conclusion as to his

"intent."

In its opinion, the majority comments that the military

judge prepared his "formal written ruling" on the motion to

suppress nine months after the trial.  The majority seems to

infer that the military judge acted inappropriately by

submitting his written findings after the trial.  After this

lengthy verbatim record was prepared and given to the military

---

[19] The military judge was not asked to determine whether
Appellant's confession was involuntary based on the cohercive
"religious atmosphere," however, and the majority seems to have
raised and resolved the issue on behalf of the defense under the
guise of the clergy privilege.
[20] The military judge stated in his findings on the motion: (1)
that Appellant did not intend for the communications to be
confidential; (2) that had he intended that the communications
be confidential he would not have spoken with Rev. Virgo present
or brought his wife back to Rev. Dennis's office; (3) that
Appellant's motivation in agreeing to meet Rev. Dennis was not
for the purpose of seeking spiritual guidance or as a matter of
conscience; and (4) that Appellant never asked for spiritual
guidance, absolution, or God's forgiveness.

judge, he prepared his factual findings.[21]  See 1 Francis A.

Gilligan & Fredric I. Lederer, Court-Martial Procedure § 14-

64.30, at 584 n.245 (2d ed. Supp. 2004).[22]

> How rulings are entered in trials by courts-martial
> varies according to the circumstances of the case,
> local resources, and local practice.  Most rulings on
> simple evidentiary objections are entered orally on
> the record at the time the objection is made.  As to
> motions to suppress and motions in limine, some
> military judges enter their ruling and essential
> findings orally or in writing on the record
> contemporaneously.  Others enter their ruling orally,
> followed by written essential findings.  In any case,
> in view of the Rules for Courts-Martial . . . , divers
> local practices and customs, and the absence of any
> trial court rules before us, we cannot lay down any
> hard and fast rule on how rulings on suppression
> motions are made at trial.  Instead, we must give
> weight to the local practice and to the intentions of
> the military judge as manifested by his action on the
> record of the particular case.

United States v. Flores-Galarza, 40 M.J. 900, 906 (N.M.C.M.R.

1994). [23]

---

[21] R.C.M. 905(d) ("Where factual issues are involved in determining a motion, the military judge shall state the essential findings on the record.").  See also United States v. Doucet, 43 M.J. 656, 659 (N-M. Ct. Crim. App. 1995) (Although the court urged the importance of entering essential findings contemporaneously with the ruling, the court noted that "[t]he usual remedies for a failure [of the military judge] to enter the required essential findings are a rehearing or return of the record of trial to the military judge for entry of the essential findings.").

[22] See also R.C.M. 905(f) (permitting reconsideration by the military judge of any ruling, other than one of "not guilty," prior to authentication of the record of trial); United States Army, Trial Judiciary Standard Operating Procedure, Chap. 18, para. 11 (May 1, 2003) (explaining that "[i]f special or essential findings are made in a memorandum format, the memorandum must be appended to the record of trial as appellate exhibit before authentication.")

Our justice system places a lot of responsibility and trust in our military judges.  Unless the evidence shows otherwise, we should not assume military judges will take the opportunity to prepare essential findings after a ruling as a post hoc rationalization for the ruling.  In light of the fact that a military judge can reconsider his findings on all motions except findings of not guilty before authentication of the record, we cannot overreact to military judges who pen their findings after trial but before authentication.  The majority seems to overlook the fact that the military judge made his ruling on the record and summarized the basis for his ruling at that time.  Since this motion was the focus of the conditional plea, it is likely the military judge wanted to put his findings in a more formal format.  The critical point, however, is that the military judge made his essential findings of fact before authentication of the record.

---

[23] But cf. Flores-Galarza, 40 M.J. at 906 n.9.

> [T]he most important value of making essential findings contemporaneously with the ruling is the discipline it affords the decision maker and the integrity it brings to the decision-making process.  If essential findings are prepared after the ruling, they may become nothing more than a post hoc rationalization.  Hence, the far better practice is to enter the ruling and essential findings contemporaneously.

Id.

United States v. Shelton, No. 04-0359/AR

Additionally, I notice a disturbing trend by the majority. In United States v. McNutt,[24] this Court considered as fact what the court below considered arguendo. In United States v. Harvey, __ M.J. __ (1) (C.A.A.F. 2006) (Crawford, J., dissenting), this Court converts what purports to be a statement of counsel into evidence to reach its conclusion. Finally, in United States v. Warner,[25] this Court considered a very lengthy appellate exhibit as facts, and yet, this Court now implies that it was somehow improper for the military judge to see the record before making his formal findings.

## ATTENUATION

Assuming that the clergy privilege applies in this case, the parties recognized at trial that Appellant made additional statements to others regarding the abuse of his stepdaughter. The defense argued at trial that these statements should also be excluded because they were "made only because there had been a breach of the clergyman-penitent privilege. . . ." The defense motion that Appellant's conditional plea sought to preserve clearly extended to suppression of "any and all evidence seized, collected, and developed as result of the breach of his confidential communication to his pastor. . . ." Nevertheless, the issue before the military judge, the CCA, and this Court,

---

[24] 62 M.J. 16, 24-25 (C.A.A.F. 2005) (Crawford, J., concurring in part and dissenting in part).
[25] 62 M.J. 114, 124 (C.A.A.F. 2005) (Crawford, J., dissenting).

21

does not preclude the conclusion that the "evidentiary error" regarding the privileged communication was harmless since Appellant's statements to the CID agent and the psychotherapist were attenuated and prove Appellant's guilt. See Moreno, 20 M.J. at 627 ("An error not of constitutional dimension may be found harmless if the fact finder was not influenced by it or if the error had but a slight effect on the resolution of the issues in the case.").

As evidenced by the facts in the record of trial, Appellant's subsequent statements were attenuated from the initial confession to Rev. Dennis and Appellant's wife. Seventeen days after Appellant spoke to Rev. Dennis, he made a sworn statement to CID after being properly advised of his rights and waiving them. At the time of this statement, he was not bullied or threatened in any way.

In the past, a conditional plea did not preclude this Court from examining any derivative evidence or a secondary basis for affirming the ruling on the motion. See, e.g., United States v. Robinson, 58 M.J. 429, 432-34 (C.A.A.F. 2003) (in a conditional plea case, the Court went beyond the question of probable cause and examined a secondary basis in upholding the investigative stop -- reasonable suspicion); United States v. Lichtenhan, 40 M.J. 466, 469-70 (C.M.A. 1994) (in a conditional plea case, this Court held that the subsequent statement to the Naval

Investigative Service was admissible and not tainted by the prior, unwarned statement). The majority's reliance on United States v. Barror, 23 M.J. 370 (C.M.A. 1987), is also misplaced. In that case, this Court concluded that the government's only significant evidence of the appellant's guilt was not admissible and, as a result, the government had no other "legally competent evidence" available to establish the appellant's guilt. Id. at 373. In this case, there were at least three other statements by Appellant to three different individuals.[26] These statements were made by Appellant seventeen days after his statements to his wife and Rev. Dennis and, thus, any potential taint had dissipated. In addition, the Government had the statements by Appellant's stepdaughter to Mrs. Shelton and Mrs. Shelton's observations of her conduct. With this other evidence, the Government could meet its burden of proving Appellant's guilt with "legally competent evidence."

Once again, however, this Court selectively decides when it wants to follow its own precedent. See United States v. Aleman, 62 M.J. 281, 284-85 (C.A.A.F. 2005)(Crawford, J., dissenting). In the past, this Court has evaluated the prejudice from erroneous evidentiary rulings by "weighing (1) the strength of the Government's case, (2) the strength of the defense case, (3)

---

[26] Appellant made some general admissions to the social worker, Ms. Doyle. He also made detailed admissions to SA Proctor of CID and to Mr. Comte, the psychotherapist.

the materiality of the evidence in question, and (4) the quality of the evidence in question."  United States v. Kerr, 51 M.J. 401, 405 (C.A.A.F. 1999).  The other "legally competent evidence" in this case clearly supports the Government's burden of proof and a finding of guilty on the affected specifications and charge.

CONCLUSION

Because I would resolve that question in favor of the military judge's ruling regarding the application of the clergy privilege, I would hold that Appellant did not prevail, that his plea was provident, that Appellant may not withdraw his plea, and that the findings and sentence should be affirmed.